[Civ. No. 59019. Second Dist., Div. Two. Jan. 30, 1981.]

PROTESTANT EPISCOPAL CHURCH
IN THE DIOCESE OF LOS ANGELES et al.,
Plaintiffs and Respondents, v.
JOHN D. BARKER et al., Defendants and Appellants

**604**

COUNSEL

Frederick A. Morgan, Robert J. Stumpf, Bronson, Bronson & McKinnon, Stephens, Martin, Berg & Lasater, R. Wicks Stephens II and Robert B. Leck III for Defendants and Appellants.

O'Melveny & Myers, R. Bradbury Clark, John G. Niles, Franklin A. Gevurtz, Windels, Marx, Davies & Ives and Kenneth W. Greenawalt for Plaintiffs and Respondents.

OPINION

FLEMING, J.—The question: Do four Los Angeles churches which have seceded from their regional and national affiliation lose title to church property held in their own names? Yes, say the general church organizations with which the local churches have been heretofore affiliated. No, say the seceding local church organizations which hold title.

This litigation arose as a result of a doctrinal controversy within the general church involving ordination of women as priests and interpretation of the Nicene Creed. The four local church congregations, and others not involved in this litigation, dissatisfied with the resolution of the doctrinal controversy by the church's general convention held in 1976, withdrew their affiliation from the regional and national church bodies, but retained possession and control over local church property standing in the name of the local church organizations. Plaintiffs, the Protestant Episcopal Church in the Diocese of Los Angeles, a California corporation (Diocese), and the Protestant Episcopal Church in the United States of America, an unincorporated association (PECUSA), brought these four separate actions to obtain title and possession of the property of the seceding church organizations. The principal defendants are four local membership corporations created under the California nonprofit corporation law on the dates indicated to operate parish churches—St. Matthias (1910), St. Mary's (1930), Our Saviour (1944), and Holy Apostles (1963).[1] In a consolidated trial of the four actions the trial court ruled in favor of plaintiffs, determining that property in the name of the four local churches was held by defendant corporations for the benefit of the members of the Diocese and PECUSA. The court's determination was grounded on theories of hier-

---

[1]More formally, the church bodies (parishes), which, with their respective rectors (presidents) and vestrymen (directors), constitute the defendants herein, are named the

archy and implied trust. Defendants, the local church organizations, have appealed.

The issue, simply put, is whether the local church organizations are entitled to keep church property standing in their own names, or whether they must surrender it to the regional and national church organizations as property held in trust for the general church membership.

■ Our starting point is the presumption that the owner of legal title to property is presumed to be the owner of the full beneficial title to the property, a presumption rebuttable only by clear and convincing proof to the contrary. (Evid. Code, § 662; Civ. Code, § 1105.) Since the disputed properties are held in the names of the local church organizations, the latter presumptively own the full beneficial interest in these properties, unless the general church organizations succeed in establishing their claims to ownership and possession by clear and convincing evidence. This they purport to have done through three alternative theories, the validity of any one of which, they assert, entitles them to the beneficial interest in the disputed church properties:

(a) Hierarchical theory.

(b) Implied trust theory.

(c) Express trust theory.

■ The *hierarchical theory* asserts that when a general church has been organized and operated as a closely knit organization, when a hierarchical chain of command controls decisions in both ecclesiastical and temporal matters, and when there are superior ecclesiastical authorities which retain ultimate power of disposition, the decisions of such ecclesiastical authorities (tribunals or individuals) control the disposition of church property. Under the hierarchical theory centralized church control over church property supersedes civil law disposition of church property. Under a hierarchical system of church governance the canons and rules of the general church override any disposition of local church property mandated by state law.

---

Rector, Wardens and Vestrymen of St. Matthias Parish at Los Angeles, California (St. Matthias), the Rector, Wardens and Vestrymen of St. Mary of the Angels' Parish, in Hollywood, Los Angeles, California, (St. Mary's), the Rector, Wardens, and Vestrymen of Church of Our Saviour, in Los Angeles, California (Our Saviour), and the Rector, Wardens and Vestrymen of the Church of the Holy Apostles in Glendale, California (Holy Apostles).

■ The *implied trust theory* asserts that a local church accepts and holds local church property for the benefit of the entire membership of the general church. A local church affiliated with a general church is impliedly bound to hold its church property as a charitable trust for the benefit of the specific religious use in effect at the time it acquired the property. If thereafter the local church attempts to apply the church property to a different religious use, it cannot do so, and the property reverts to a trustee who must apply it to its original religious purpose. Specifically, plaintiffs argue the existence of an implied trust to benefit the entire membership of the general church, for whom they are the appropriate and ultimate trustees.

The *express trust theory* relies on title deeds, articles of incorporation, canons and rules of the organizations concerned and statutes, to establish that a local church holds property under an express trust for the benefit of the general church membership as embodied in its regional and national organizations.

Before discussing these theories, we review the relevant facts of the cause.

## I

### FACTS

The Protestant Episcopal Church in the United States of America (PECUSA), organized in 1789, was the product of secession of the Anglican church in the colonies from the Church of England, the latter church itself being the product of secession from the Church of Rome in 1534. (The court takes judicial notice that the seceding churches in the two earlier secessions took their property with them.) PECUSA, an unincorporated association, is governed by a general convention and a presiding bishop. Affiliated with it are 93 dioceses, each of which is governed by a diocesan convention and a bishop. A diocese in turn operates missions and admits parish churches to constituent membership in the diocese and PECUSA. Normally, the property of a mission is held in the name and under the control of the diocese and its bishop, while the property of a parish is held in the name and under the control of the parish church. In California the parish church is usually organized as a nonprofit membership corporation run by an elected board of vestrymen which acts as a board of directors. The rector of the parish acts as the

president of the church corporation. The communicants of the parish congregation are the members of the church corporation.

We review briefly the organizational history of the four defendant churches:

1. *St. Matthias.* St. Matthias church was organized as a diocesan mission in 1905 and admitted to parish membership in the Diocese in 1907. Title to its property has always been held in the name of the local church organization. In 1910 St. Matthias was incorporated as a non-profit membership corporation. Its articles of incorporation declared the parish would form a constituent part of the Diocese in that branch of the Holy Catholic Church now known as PECUSA, and that the constitution, canons, and discipline of the Diocese and PECUSA would always form part of its articles and bylaws. The articles established no specific limitation or restriction on the holding or disposition of property by St. Matthias.

Over the years no moneys were given by the Diocese or PECUSA to St. Matthias. On the contrary, the flow of funds was in the other direction, and during the period of its affiliation St. Matthias contributed approximately $127,000 to the Diocese.

The members of the church corporation were its congregation, which elected its board of directors (vestry), which in turn elected its president (rector). The church's temporal affairs were run by its vestry, but transfers and incumbrances of real property and the selection of rectors were subject to approval by the Diocese. The church corporation had complete legal autonomy in its affairs, and as a membership corporation it was authorized to amend its articles of incorporation on approval of its board of directors and its membership. However, as a constituent part of the Diocese and PECUSA it was required to conform to the constitution, canons, and church discipline of the Diocese and PECUSA. At the time of St. Matthias' admission to parish status in 1907 the Diocesan canons required that on admission of a parish its communicants promise that the parish would be forever bound by the ecclesiastical authority of the bishop of Los Angeles and PECUSA, that the constitution and canons of the Diocese and PECUSA would be incorporated in the parish's bylaws, that the parish would accede to the constitution, canons, doctrine, and worship of PECUSA and the constitution and canons of the Diocese.

In 1958 Diocesan Canon 10.06 was adopted, which declares that on dissolution of a parish its property shall be conveyed to the Diocese.

In January 1977 the vestry of St. Matthias voted, and its membership approved, an amendment to St. Matthias' articles of incorporation deleting all references to the Diocese and to the Holy Catholic Church known as PECUSA, and identifying its corporate purpose as the maintenance of a parish as a constituent part of the Holy Catholic Church in the Anglican tradition. In February 1977 representatives of St. Matthias advised the Diocese and PECUSA that St. Matthias was withdrawing its affiliation and severing its ecclesiastical connection with the regional and national church.

2. *St. Mary's Church.* St. Mary's Church was admitted as a mission in 1919, incorporated under California law in December 1930, and admitted to parish status in the Diocese in January 1931. Title to its property is held in the name of the local church organization. Its articles of incorporation declared that the parish would form a constituent part of the Diocese in that branch of the Holy Catholic Church known as PECUSA and that the constitutions, canons, and discipline of the Diocese and PECUSA would always form part of its bylaws and articles. The corporation was authorized to hold property and transact business in a manner not contrary to the constitutions, canons, and discipline of the Diocese and PECUSA. The operation of the church corporation was similar to that of St. Matthias, as were the relevant canons of the Diocese and their amendment in 1958.

Neither the Diocese nor PECUSA contributed money to St. Mary's or toward the purchase of its real property, and the flow of funds was from St. Mary's to the Diocese, a flow amounting to $161,000 during the years 1920 to 1974.

In January 1977 the vestry and the members of the corporation amended St. Mary's articles of incorporation by deleting all references to the Diocese and PECUSA, and identifying its corporate purpose as the maintenance of a parish as a constituent part of the Holy Catholic Church in the Anglican tradition. In February 1977 their representatives advised the Diocese and PECUSA that St. Mary's was withdrawing its affiliation and severing its ecclesiastical connection with the regional and national church.

3. *Our Saviour Church.* Our Saviour Church was organized as a mission in 1930, and during its missionary period title to its real property remained in the name of the bishop of the Diocese. In 1944-1945 it filed articles of incorporation, became a parish, and acquired title to its church property. Like the previously mentioned churches, its articles of incorporation declared that its purpose was to establish a parish as a constituent part of the Diocese in that branch of the Holy Catholic Church now known as PECUSA, to hold property, and to transact business and encumber or alienate property in accordance with the constitutions and canons of the Diocese. As did the articles of the other churches, its articles declared that the constitution, canons, and discipline of the Diocese and PECUSA would always form part of its bylaws and articles of incorporation.

Our Saviour made regular annual contributions to the Diocese amounting over the years to $51,000.

In January 1977 the vestry and its membership approved an amendment to the articles of incorporation to delete all references to the Diocese and PECUSA and to identify its corporate purpose as the maintenance of a parish as a constituent part of the Holy Catholic Church in the Anglican tradition. Like the other churches, Our Saviour advised the Diocese and PECUSA it was withdrawing its affiliation and severing its ecclesiastical connection with the regional and national church bodies.

4. *Holy Apostles Church.* This church was organized as a mission in 1936 and continued as such until it became a parish in 1956. Thereafter it was incorporated in 1963. Title to its property is held in the name of the local church organization.

Holy Apostles' articles of incorporation, adopted in 1963, are the most recent of the four with which we deal, and they differ in significant respects from those of the three churches incorporated earlier. In addition to the stated purpose of operating a parish church as a constituent part of that branch of the Holy Catholic Church known since 1789 as PECUSA, the articles also specifically identify Holy Apostles Church as a *subordinate body* and integral unit of PECUSA and as a *subordinate body* of the Diocese within the meaning of Corporations Code sections 9203 and 9802,[2] sections which defined a subordinate

---

[2]Section 9203: "A nonprofit corporation may be formed for the purpose of incorporating any subordinate body instituted or created under the authority of any head or

body of a national body, and provided that on revocation or surrender of the charter of a subordinate body its assets shall be distributed to the national body. Again unlike the articles of incorporation of the three other churches, the articles of Holy Apostles declare that the property of the corporation is irrevocably dedicated to religious or charitable purposes, and that on liquidation or dissolution its property will inure to the benefit of a fund organized and operated for religious or charitable purposes by the Diocese.

One further point differentiates Holy Apostles from the three other churches. Holy Apostles is the only church incorporated subsequent to the adoption in 1958 of Diocesan Canon 10.06, which declares that on dissolution of a parish its property shall be conveyed to the Diocese.

In January 1977 the vestry voted, and the membership approved, an amendment to the articles of incorporation similar to that adopted by the other three churches. By resolution in February 1977 the congregation of Holy Apostles disassociated itself from the Diocese and PECUSA, declaring that the latter had become schismatic from the Holy Catholic Church.

In sum, the articles of incorporation of Holy Apostles differ significantly from those of the three other churches, in that the church is specifically identified as a subordinate body of a national body, in that specific reference is made to those provisions of the Corporations Code which provide that on surrender or revocation of the charter of a subordinate body the latter shall be dissolved and its property delivered to the national body to be disposed of in accordance with the laws of the

---

national association, lodge, order, beneficial association, fraternal or beneficial society, labor union, foundation, federation, or any other society, organization, or association. The fact that the head or national body is unincorporated does not prevent the incorporation of the subordinate body.

"The rules governing the incorporation and operation of unincorporated associations govern the incorporation of any subordinate body.

"The seal of the subordinate body shall be its corporate seal."

Section 9802: "Whenever the charter of a subordinate body incorporated pursuant to this part is surrendered to, taken away, or revoked by the head or national body granting it, the subordinate body shall dissolve. The subordinate body shall pay its debts and obligations or make adequate provision therefor. The subordinate body may collect obligations owed to it and may sell property which is not designed for the exclusive use of the organization. The subordinate body shall then deliver any remaining property or obligations owed to it and any remaining proceeds of the sale of property to the head or national body, to be disposed of in accordance with the laws of the head or national body." (Eff. Jan. 1, 1980, these sections were recodified as part of the Nonprofit Corporation Law. See Corp. Code, § 5000 et seq.)

national body, and in that specific provision is made that on dissolution the church's property will inure to the benefit of the Diocese.[3]

On the basis of the foregoing facts, the trial court awarded title and possession of the property of the four local churches to the Diocese and PECUSA on two theories: (a) the Protestant Episcopal Church is organized in hierarchical fashion, and the decisions of the church hierarchy control both ecclesiastical matters and disposition of local church property, which decisions are binding on the courts; (b) the property of the four local churches was impliedly held as a charitable trust for the benefit of members of the Diocese and PECUSA, i.e., the general church organizations. (Presumably, the general church organizations in turn would hold the property for the benefit of their general communicants.) The court rejected the theory of express trust.

On appeal, defendants-appellants, who are the local churches, argue against both the hierarchical and implied trust theories and assert that the cause should have been resolved on the basis of express trust by use of neutral principles of law. Plaintiffs-respondents argue that the judgment of the trial court is sustainable both on implied trust theory and on hierarchical theory, and sustainable as well, although the trial court found to the contrary, on the theory of express trust.

II

HIERARCHICAL THEORY

The leading American case setting out the theory of hierarchy is *Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679 [20 L.Ed. 666], where the court held that when a religious congregation or ecclesiastical body holding church property is a subordinate body of an organization in which there are superior ecclesiastical tribunals possessing general and ultimate power of control over church matters, the decisions of such tribunals control church property disputes to the exclusion of the civil courts. The hierarchical theory asserts that when a subordinate congregation of a hierarchical church secedes from the church, it has no right

---

[3]Subsequent to the filing of these actions the Corporations Code was further amended (effective, Jan. 1, 1980) by adoption of a comprehensive Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.), which provides that articles of incorporation of a subordinate corporation may require dissolution on the loss of its charter and may require distribution of its assets to the head organization (Corp. Code, § 9132).

to retain church property held in its own name. Essentially, the hierarchical theory subordinates civil control of church property to ecclesiastical control of church property. Under this theory the canons and rules of a general church override general principles of legal title in the resolution of church controversies over property.

However, in the years since *Watson* v. *Jones* was decided in 1872, the United States Supreme Court has embraced another theory of resolving church property disputes, a theory initially expounded in *Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601]. The court there ruled that under the First Amendment a civil court is not allowed to adjudicate church property disputes by interpreting religious doctrine and practice and then relying on its own interpretation of doctrine to allocate control over church property. The opinion did not attempt to prescribe specific alternative methods a court must use to resolve church property disputes, but it noted that "neutral principles of law, developed for use in all property disputes, . . . can be applied without 'establishing' churches to which property is awarded." (393 U.S. at p. 449 [21 L.Ed.2d at p. 665]; see also, *Md. & Va. Churches* v. *Sharpsburg Ch.* (1970) 396 U.S. 367 [24 L.Ed.2d 582, 90 S.Ct. 499].)

The use of neutral principles of law to resolve church property disputes was again approved by the United States Supreme Court in the recent opinion in *Jones* v. *Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020], a decision rendered subsequent to the judgment of the trial court in this cause. The issue, similar to that at bench, was described in the opinion as follows: "This case involves a dispute over the ownership of church property following a schism in a local church affiliated with a hierarchical church organization. The question for decision is whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the disputes on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." (P. 597 [61 L.Ed.2d at pp. 780-781].)

The facts were that title to the disputed church property had been held in the name of the local seceding church, that funds to acquire the property had been contributed entirely by local church members, but that *the general body* with which the local church was affiliated, the Presbyterian Church, operated under a hierarchical and not a congrega-

tional form of church government. The Georgia trial court examined the title deeds, statutes, corporate charters, and constitution, rules, and regulations of the general church to determine ownership and control of the disputed church property, and it concluded that under neutral principles of law no trust arose in favor of the general church, and that legal title to the property determined its ownership. Accordingly, it confirmed ownership of the disputed property in the local congregation. The Georgia Supreme Court affirmed. On review, the United States Supreme Court indicated its approval of the use of neutral principles of law by state courts to settle church property disputes, and it concluded that state courts need not defer to the rulings of a church hierarchy in settling such disputes among competing claimants: "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all form of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members." (443 U.S. at Pp. 603-604 [61 L.Ed.2d at pp. 784-785].)

*Jones* v. *Wolf, supra*, was a five-to-four decision, with a vigorous dissent by justices who favored continued use of the hierarchical theory and deferment by civil courts to ecclesiastical authorities in church property disputes. However, such views were those of a minority and did not constitute the opinion of the court. The majority pointed out that issues of control over church property are difficult to separate from issues of doctrinal controversy over church authority, that neutral principles of law promise to free a court from the necessity of inquiry into church doctrine, polity, and practice, and allow it to rely on objective, well-established concepts of trust and property law to dispose of disputed church property.

■ The conclusion to be drawn from *Jones* v. *Wolf, supra*, 443 U.S. 595, is that a state, if it so desires, may resolve disputes over church property through use of neutral principles of law without violating the First and Fourteenth Amendments. It need not adopt a rule of compulsory deference to religious authority in resolving church property disputes, even when issues of doctrinal controversy are not involved. The sources to be used to settle such disputes are the deeds to church property, the articles of incorporation of the local church, the state statutes, and the rules of the general church organization.

We next turn to California law to determine what legal principles California courts employ to resolve disputes over church property. Fortunately, we have the benefit of the comprehensive analysis of the problem in the court's opinion written by Justice Kaufman in *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) 89 Cal.App.3d 910 [152 Cal.Rptr. 854], a cause likewise determined subsequent to the judgment of the trial court at bench. That opinion places California law squarely in the neutral-principles camp. Its analysis of prior California cases is wholly persuasive of its conclusion that California has rejected the hierarchical theory as the basis for resolution of church property disputes and has adopted in its place neutral principles of law.

In *Presbytery of Riverside, supra*, the local church had been incorporated under California law, and title to its property was held in its own name. On the local church's secession from the general church with which it had theretofore been affiliated, the general church sought to obtain ownership and possession of the local church property, relying on those rules of the general church which state that whenever a local church has been formally dissolved or abandoned, its property reverts to the general church. The general church was organized along hierarchical lines and had been given specific authority to supervise certain business activities of local affiliated churches. The rules of the general church contained provisions, similar to those in the canons at bench, which required a local church to obtain permission to sell or mortgage its real property. The trial court ruled in favor of the local church. On appeal, the appellate court concluded that the hierarchical theory set out in 1872 by *Watson* v. *Jones, supra*, 80 U.S. 679 does not apply in California, that state courts in California adjudicate disputes involving ownership or right to possession of church property on the basis of neutral principles of law. The court rejected the general church's

contention that the property of a local church which is part of a general hierarchical church is held in trust as a matter of law for the benefit of the general church. (P. 925.) The court also rejected the claim that the general church and its congregants were, as a matter of law, the beneficiaries of an implied trust. It noted that the statement in *Watson v. Jones, supra*, "trustees obviously hold possession for the use of the persons who by the constitution, usages and laws of the Presbyterian body, are entitled to that use" leaves unanswered the vital question of the identity of the persons entitled to such use. It held that the critical determinations in such causes are not determinations of law but those of fact. (P. 927.) The court then concluded that, despite the rules of the general church that on dissolution of the local corporation all property reverts to the general church, in instances of disaffiliation for reasons of doctrinal controversy legal title to church property is the controlling factor. On the basis of neutral principles of law, the appellate court upheld the trial court's ruling that ownership and possession of the disputed church property remained with the local church.

From *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) 89 Cal.App.3d 910 [152 Cal.Rptr. 854], we conclude that California has adopted neutral principles of law as the basis for resolution of church disputes; that use of the hierarchical theory is restricted to doctrinal and ecclesiastical controversies and does not extend to property disputes; that property disputes between ecclesiastical claimants, like property disputes between temporal claimants, must be resolved by neutral principles of law. We, therefore, reject and disapprove the reliance placed by the trial court on hierarchical theory as a means of adjudicating this cause.

## III

### Implied Trust

Plaintiffs-respondents also rely on a theory of implied trust to support their entitlement to the property of the four seceding churches.

Under this theory the local church holds its property as trustee of an implied trust for the direct benefit of the Diocese and PECUSA and the ultimate benefit of present and future members of the Diocese and PECUSA. The theory of implied trust contemplates that members of a parish are beneficiaries of the trust only so long as they remain mem-

bers of the Diocese and PECUSA. In a sense this argument is closely related to the hierarchical argument, but it appears to contemplate that the direct beneficiaries of the implied trust are institutional rather than individual. In essence, the theory of implied trust rests on the proposition that contributions and gifts to the local church are impliedly given in trust for the benefit of the general church—that the beneficiaries of such contributions are Protestant Episcopalians at large rather than members of the parish. The theory of implied trust thus rejects the named trustee (the local church) and the known beneficiaries (the local congregation) in favor of distant trustees (the Diocese and PECUSA) and unknown beneficiaries (Protestant Episcopalians in general).

A similar argument was rejected, and the implied trust theory repudiated, by the Georgia Supreme Court in the series of cases which led to the United States Supreme Court's opinion in *Jones* v. *Wolf* (1979) 443 U.S. 595, 599-601 [61 L.Ed.2d 775, 782-783, 99 S.Ct. 3020]. Originally, the Georgia Supreme Court sought to resolve church property disputes by evaluating the merits of the disputed doctrines and practices which had caused the controversy and ruling that a local church affiliated with a hierarchical general church impliedly holds its property in trust for the general church so long as the general church had not substantially abandoned the doctrines it followed at the time of affiliation. (*Presbyterian Ch.* v. *Eastern Hts. Presbyterian Ch.* (1968) 224 Ga. 61 [159 S.E.2d 690].) (This method of resolving property disputes in hierarchical churches is sometimes referred to as the English approach. See *Jones* v. *Wolf, supra,* p. 599 [61 L.Ed.2d, p. 782].) But the United States Supreme Court reversed that decision, holding that by reason of the First and Fourteenth Amendments civil courts are not authorized to resolve church disputes over doctrine and practice. (*Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601].) Thereafter, the Georgia Supreme Court concluded that the implied trust theory would have to be abandoned in its entirety. (*Presbyterian Church in U.S.* v. *Eastern Heights Pres. Ch.* (1969) 225 Ga. 259 [167 S.E.2d 658]; *Carnes* v. *Smith* (1976) 236 Ga. 30 [222 S.E.2d 322]; *Jones* v. *Wolf* (1978) 241 Ga. 208 [243 S.E.2d 860].)

The considerations which led the Georgia court to this conclusion are evident. A civil court is ill-equipped to evaluate church doctrine and ill-equipped to resolve controversies involving the exercise of ultimate church authority. Almost inevitably, implied trust entangles the court in the disputants' conflicting views of church policy, where theological and

legal principles may be closely interwoven. For example, a patriarch may be the spiritual leader and ruler of a particular church. Does this mean he also disposes of its property? Implied trust tends to involve a civil court in the intangibles of church organization, where authority intertwines with theology, and the extent of the former depends on the view taken of the latter. The heart and soul of the implied trust theory is its assumption that the general church is the custodian of the true faith, that those who contribute to a local church have the tenets and doctrines of the general church in mind in making their contributions. Hence, severance of the local church's affiliation with the general church breaches faith with past contributors, a breach which brings into being an implied trust in local church property for the benefit of the general church, which, it is assumed, conducts itself in harmony with the wishes of earlier donors. The trust must be implied, because the property has been given to the local church and not, as it might have been, to the general church.

But implied trust cuts two ways.

It may be argued, as it has been theologically argued in the controversy which underlies these four actions, that it is the general church which has strayed from the true faith, that any implied trust should properly be for the benefit of the local church.[4] How can a civil court rule on such an argument? The difficulty inherent in implied trust has been cogently pointed out in *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) 89 Cal.App.3d 910, at pages 928-929 [152 Cal.Rptr. 854]. "[T]he effect of *Watson* v. *Jones* was the rejection or repudiation of the very doctrine that appellants appear to invoke—the implied trust doctrine holding that church property was the subject of an implied trust in favor of those who adhered to the faith of the founders of the church. . . . A concomitant of this implied trust doctrine was the necessity for the court to examine in great detail questions of religious doctrine in its determination as to which group of claimed beneficiaries continued to adhere to the 'true' faith and which had departed from the 'true" doctrine. . . . That is precisely what *Watson* v. *Jones* held a civil court is not permitted to do. . . . If the implied trust doctrine was ever the law in this state . . . , it appears to have been repudiated in *Rosicrucian Fellow* v. *Rosicrucian etc. Ch., supra,* 39 Cal.2d

---

[4]The seceding churches claim to be the true Holy Catholic Church which continues the Anglican Communion in the tradition of Anglo-Catholicism.

[121] at pages 133-134 [245 P.2d 481], where, in rejecting an argument based on adherence to the 'original structure,' the court stated: 'The basic question in a controversy such as this should be the ownership of civil and property rights as shown by the conduct and acts of the parties....'"

The implied trust theory almost inevitably puts the civil courts squarely in the midst of ecclesiastical controversies, in that every dispute over church doctrine which produces strongly held majority and minority views forces the court to determine the true implied beneficiaries of the church entities involved. If the civil courts cannot properly determine which competing group is the bearer of the true faith, they cannot determine for whose benefit title to church property is impliedly held in trust. The difficulties in such a controversy are illustrated by the facts in *Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679 [22 L.Ed. 666], where the local church, the regional church, and the general church, each contained factions of differing views, and each gave contradictory interpretations of church doctrine. We do not repeat the analysis of earlier California cases set out in *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) *supra*, 89 Cal.App.3d 910, but merely report our agreement with its conclusion that the doctrine of implied trust furnishes a poor basis for the resolution of controversies involving ownership and control of church property.

The original implied trust doctrine held that church property is the subject of an implied trust for the benefit of those who adhere to the doctrines of the founders of the church. Plaintiffs-respondents, recognizing that the original doctrine is now constitutionally impermissible under the First and Fourteenth Amendments, modify it to read that local church property is subject to an implied trust in favor of a hierarchical general church organization of which the local church has been a member. Acceptance of such a theory would lead us back to the thicket of ecclesiastical controversy, for a court would be required to deduce and infer the nature of the general church and its implied authority over the property of its affiliated congregations. We reject the theory of implied trust, because as concluded by the Georgia Supreme Court, it is one impossible to administer. (*Presbyterian Church in U.S.* v. *Eastern Heights Pres. Ch.* (1969) 225 Ga. 259 [167 S.E.2d 658].)

Plaintiffs-respondents also draw on the analogy of charitable trusts to imply a trust by reason of the abandonment by the four seceding

church organizations of their original stated purpose of operating parish churches as integral parts of the Diocese and PECUSA. Essentially, respondents argue that disaffiliation from the Diocese and PECUSA is such a departure from the purpose for which the churches were created that an implied trust arises for use of their property to further the original purpose.

We note, first, that defendants-appellants maintain there has been no departure from original purpose by them, that on the contrary it is the general church which has strayed from the original purpose of the Anglican Communion, and it is the local churches which have remained faithful to the Holy Catholic Church in the Anglican tradition. It is apparent that departure from original charitable purpose returns us once again to the forbidden field of evaluation of church doctrine. The charitable trust cases relied on by respondents are not in point. Although each of the articles of incorporation of the local churches states that its purpose is to operate a parish as a constituent part of that branch of the Holy Catholic Church now known as PECUSA, in our view nothing in such a statement so circumscribes original charitable purpose as to require forfeiture of church property on change of affiliation to another branch of the Holy Catholic Church, whether Anglo Catholic, Roman Catholic, Greek Catholic, Greek Orthodox, Russian Orthodox, or some other related rite. The cases relied on by respondents either refer to instances where the charitable trust is no longer operating as such but has sought to make itself a proprietary venture (*In re Los Angeles County Pioneer Society* (1953) 40 Cal.2d 852 [257 P.2d 1]), where the organization's status as a tax-exempt charity has been questioned (*Pacific Home* v. *County of Los Angeles* (1953) 41 Cal.2d 844 [264 P.2d 539]), where the charitable trust has abandoned operations and voted to dissolve (*In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850 [121 Cal.Rptr. 899]), where removal of the trustees for mismanagement has been sought by the Attorney General (*Brown* v. *Memorial Nat. Home Foundation* (1958) 162 Cal.App.2d 513 [329 P.2d 118]), or where a charitable corporation seeks to devote part of its assets to enterprises adopted for profit (*Queen of Angels Hospital* v. *Younger* (1977) 66 Cal.App.3d 359 [136 Cal.Rptr. 36]). None of these factors is relevant here. No attempt has been made to change a nonprofit operation into one operated for profit. No financial mismanagement is charged. No improper use of another organization's name or false representations of nonexistent affiliation are involved. The four local churches are now operating physically the same way they

did before the breach with the general church. They continue to hold religious services with the same clergy and the same communicants and on the same premises. The sole change has been severance of affiliation with the general church by reason of doctrinal differences. We think this change no more compromises charitable purpose than would a switch by a hospital from homeopathic to allopathic medicine or by a psychiatric clinic from Freudian to Jungian theory. We note, too, the opinion of the Attorney General, a nominal party to the action, to the effect that because the property in dispute is being used for ecclesiastical purposes, no violation of the general charitable trust law is involved. Respondents' argue that the charitable purpose of the four local churches is to further the activities of the Diocese and PECUSA and that this purpose cannot be carried out in the absence of affiliation. We do not construe charitable purpose so narrowly, nor do we believe that affiliation with a particular charitable organization is a necessary concomitant of charitable function.

In sum, the difficulties noted by the Georgia Supreme Court in use of the implied trust theory, once evaluation of theology and doctrine has been forbidden, remain insurmountable. We conclude the implied trust doctrine provides no valid basis for transferring church property from the congregation in whose name the property is held to the general church.

## IV

### EXPRESS TRUST

Strangely enough, both sides in this litigation conclude in their briefs that the trial court erred in rejecting the theory of express trust as a method of adjudicating the controversy. Both agree that express trust provides the most practicable method of resolving church property disputes. In reaching this conclusion the parties accept the arguments of the majority opinion in *Jones* v. *Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020]. And so do we.

Simply put, the issue is whether the local churches expressly hold their property in trust for the benefit of members of the Diocese and PECUSA. Did the local churches expressly agree that on withdrawal of their affiliation from the general church their property would go to the general church? At bench, the trial court found that none of the property in dispute was subject to an express trust. However, the trial court's

findings, conclusions, and judgment, rendered in 1978, preceded the important decisions of the United States Supreme Court in *Jones* v. *Wolf, supra*, 443 U.S. 595, and of the California Court of Appeal in *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) 89 Cal.App.3d 910 [152 Cal.Rptr. 854]. Thus, the trial court did not enjoy the benefit of the two most recent and controlling opinions on disposition of locally owned church property on secession of a local church from its general church. These opinions make it clear that existence of an express trust in local church property for the benefit of the general church is determinable by the same neutral principles of law used to resolve a property dispute between a local and national body of a labor union, a trade association, a disaster relief organization, a charitable trust, or any other entity which operates locally and nationally. We therefore undertake to evaluate the facts of this cause in terms of express trust through use of neutral principles of law.

■ In determining the presence or absence of an express trust in specific church property a court will look at four general sets of facts: (1) the deeds to the property, (2) the articles of incorporation of the local church, (3) the constitution, canons, and rules of the general church, and (4) relevant state statutes, if any, governing possession and disposition of such property. In *Jones* v. *Wolf (1979) supra*, 443 U.S. 595, 600, 603 [61 L.Ed.2d 775, 782-783, 784-785], the United States Supreme Court noted approvingly that both the Georgia Supreme Court and the Maryland Court of Appeals employed these factors to resolve church property disputes.[5]

a. *Title to Church Property.* Title to the disputed church property at bench is held in the names of the local churches and, with insignificant exceptions, has always been so held.

This practice contrasts with the practice followed by some other general churches (and by PECUSA itself in the instance of missions), where title to local church property is held in the name of the general church or in the name of a bishop as trustee for the general church. Neither PECUSA nor the Diocese had any requirement that title to local church property be vested in the general church. (In this respect the situation is similar to that in *Presbytery of Riverside* v. *Community*

---

[5]Cf. the Supreme Court of New Jersey, which continues to rely on the hierarchical theory to resolve church property disputes. (*Protestant Episc. Church, etc.* v. *Graves* (1980) 83 N.J. 572 [417 A.2d 19].)

*Church of Palm Springs, supra,* 89 Cal.App.3d 910, where there was no requirement that title to local church property be vested in the general church.) In this and other respects PECUSA has granted autonomy to its parishes. For administrative convenience, it is said. But the same freedom useful for administrative convenience carries the risk that congregations which disaffiliate will take their property with them.

■ Under neutral principles of law if a local body affiliated with a national body holds title to property in its own name and later secedes, the national body has little basis to claim that such property is held in trust for it. (Evid. Code, § 662; Civ. Code, § 1105.) If a local organization secedes from one national entity and affiliates with another, absent other factors no claim can be laid to property owned by and held in the name of the local organization. If a Kentucky Fried Chicken franchisee secedes from its national affiliation to join a Tennessee Fried Chicken operation, neutral principles of law do not recognize any claim by the ex-franchisor against its departing franchisee's real property. In such instances valid claims may exist for breach of contract, abuse of name, false pretenses, and the like, but ordinarily no express trust arises against the property of the local organization. Under neutral principles of law the same is true of a local church organization which changes affiliation from one general church to another.

We find nothing in the title deeds of the church properties to create an express trust in favor of the general church organizations.

b. *Articles of Incorporation of the Local Churches.* For purposes of discussion we consider separately the three local churches incorporated before 1958 and the one church incorporated thereafter.

The articles of St. Matthias, incorporated in 1910, authorize the corporation to acquire and hold church property, but say nothing about disposition of church property on dissolution of the corporation or on disaffiliation from the Diocese and PECUSA. The articles of St. Mary's, incorporated in 1930, and the articles of Our Saviour, incorporated in 1944, follow the same general form. Nothing which would create an express trust for the benefit of the Diocese and PECUSA appears in any of these articles. However, each of the articles of these three churches declares in substance that the constitution, canons, and discipline of PECUSA and the Diocese shall always form part of the articles of incorporation and prevail against anything repugnant. Such

declarations are a far cry from an express trust in church property for the benefit of the Diocese and PECUSA. Nor, did either the Diocese or PECUSA, on the various dates of these incorporations, have any existing provisions in its rules for disposition of local church property on dissolution or disaffiliation of a local church. Plaintiffs-respondents interpret these general provisions in the articles of incorporation as a kind of open ended agreement by the local churches to accept in advance any and all rules and regulations which might thereafter be put in effect by the general church. We do not believe such an interpretation accords with real property law, with contract law, with corporate law, or with trust law. Such declarations of affiliation and loyalty are nothing more than expressions of present intention. We think such declarations no more restrictive of future amendments to the articles of incorporation than would be similar statements in an automobile dealer's articles that it would always distribute General Motors products and always be bound by General Motors rules and policies, or statements in a political club's articles that it would forever support the Democratic Party and be forever bound by the latter's rules and platform. A subsequent switch of affiliation by the dealer to Ford, or by the political club to the Republican Party, would, under neutral principles of law, furnish no basis for a claim of express trust by the superseded automobile manufacturer to possession of the dealer's showroom and repair shop or a claim by the deserted political party to possession of the political club's meeting premises and bank account. As in matrimony, *always* and *forever* do not preclude a change in heart and do not create an express trust in another's property. Under neutral principles of law no express trust was created by the articles of incorporation of the three churches incorporated prior to 1958.

The articles of the fourth church, Holy Apostles, incorporated in 1963, present a somewhat different situation. Unlike the three churches incorporated earlier, Holy Apostles is identified both as an integral part and as a subordinate body of PECUSA. Again, unlike the other three churches, specific reference is made in its articles to its status as a subordinate body to PECUSA and the Diocese within the meaning of sections 9203 and 9802 of the Corporations Code, sections which, as previously noted, provide that on surrender or revocation of the charter of a subordinate body, the subordinate body shall dissolve and distribute its assets to the national body. The articles of Holy Apostles further specify that on liquidation, dissolution, or abandonment of the corporation its property will inure to the benefit of a fund organized and

operated for religious or charitable purpose by the Diocese. Under neutral principles of law the articles of incorporation of Holy Apostles may place it in a different category from the other three churches in respect to disposition of church property on secession from the general church.

c. *Constitution, Canons, and Rules of the General Church.* The constitution, canons, and rules of the Diocese and PECUSA were initially silent with respect to any express trust in favor of the general church over local church property on dissolution of the local church. At the times the three earlier churches were incorporated and acquired their property, nothing in the general church constitution, canons, and rules operated to create an express trust in local church property in favor of the general church.

In 1958, however, the canons of the Diocese were amended by the adoption of Canon 10.06, which declared that on dissolution of a parish its property became distributable to the Diocese. This canon was in effect at the time of incorporation of Holy Apostles in 1963. It is arguable that the articles of Holy Apostles incorporated by reference the then existing Canon 10.06.

d. *Statutes.* California statutory law on the relationship between local and national bodies, which includes local and general churches, was apparently silent until 1939, at which time incorporation of a subordinate body of a national body was authorized by statute and provision made for disposition of the subordinate body's assets on surrender or revocation of its charter. (Stats. 1939, ch. 148, p. 1262.) Such a provision, of course, did not affect the articles of incorporation of St. Matthias or St. Mary's, which were incorporated prior to the adoption of the statute. It could have affected Our Saviour, incorporated in 1944, but the articles of Our Saviour neither declare nor suggest that the church was being incorporated as a subordinate body to a national body.

In the articles of Holy Apostles, however, specific reference is made to these two sections of California law, and specific statement is made about the church's incorporation as a subordinate body of a national church and a subordinate body of the Diocese within the meaning of these sections. Clearly, under neutral principles of law reference to these statutory provisions is relevant to any determination of express trust.

## V

### CONCLUSION

We now put together the foregoing elements to determine whether under neutral principles of law any express trust has been created which would preclude the local churches from keeping church property held in their own names and require them to deliver such property to the general church.

■ We conclude that no express trust exists in the property of St. Matthias, St. Mary's, and Our Saviour. St. Matthias and St. Mary's held title to their property in their own names, paid for it out of their own funds, did not alienate it in any express manner in their articles of incorporation, and did not subject themselves to express restraints on their property by reason of the constitution, canons, and rules of PE-CUSA and the Diocese. It is true that these churches voluntarily conformed to certain financial requirements of the Diocese, such as filing annual financial reports and securing permission to mortgage real property. None of this, however, amounted to the creation of an express trust. The situation of Our Saviour is similar, except that at the time of its incorporation provisions existed under California law for incorporation of a subordinate body of a national body. However, nothing in the articles of Our Saviour purported to identify it as a subordinate body of a national body, and no reference was made in its articles to these statutory provisions. On the contrary, Our Saviour, like St. Matthias and St. Mary's, was identified as a constituent part of the Diocese. In the instance of this church, too, no express trust existed in its property for the benefit of the general church.

■ The last church is Holy Apostles, incorporated in 1963. That church is specifically identified as a subordinate body of a national body subject to the provisions of Corporations Code sections 9203 and 9802. It was incorporated subsequent to the adoption of Diocesan Canon 10.06 in 1958, which declares that on dissolution of a church its property shall revert to the Diocese. Its articles contain a specific provision declaring that on liquidation, dissolution, or abandonment of the corporation its property will inure to the benefit of a charitable fund organized and operated for religious or charitable purposes by the Diocese. We conclude that under neutral principles of law the property of Holy Apostles was subject to an express trust in favor of the Diocese

on revocation of its charter; that its disaffiliation and secession from the general church over the objection of the general church was the equivalent of revocation of its charter by the general church within the meaning of section 9802; that as a consequence constructive dissolution resulted; that thereafter on principles of express trust and pursuant to both statute and Holy Apostles' articles of incorporation the Diocese acquired the right to secure possession and title to Holy Apostles' church property.

The judgments in the causes dealing with St. Matthias, St. Mary's, and Our Saviour are reversed (Nos. C189571, C188907, C189572); the judgment in the cause dealing with Holy Apostles is affirmed (No. C190652). All parties will bear their own costs on appeal.

Beach, J., concurred.

**ROTH, P. J.**—I dissent.

I accept the conclusion of my colleagues that the so-called implied trust theory, insofar as it is claimed to operate in instances involving disputes among church members over the control of church property, is unacceptable in that it requires courts to interject into the litigation their own notions respecting religious doctrine which attempted application of the theory places in issue.

I likewise am of the view that, in an appropriate case, resolution of such disputes might well be made on the basis of "neutral principles of law," which, when applied to the particular facts present, require a given result.

What concerns me here and causes me to depart from the majority is the question when the neutral principles theory should be invoked.

In my view, and that of the majority, *Jones* v. *Wolf*, in its broadest sense, stands for no more than the proposition that that theory, to the extent it does not itself in operation infringe constitutional principles, is one of several alternatives acceptable for the purpose. But whether it is the alternative best suited for application to a given case seems to me quite another matter.

Here, based upon the conclusion that the declarations respecting the relationship between PECUSA, the Diocese and the local churches as

set out in the various articles of at least three of the latter "are a far cry from any express trust in church property" for the benefit of the former, the majority, in effect, looks to the fact record title is held in the names of the appellants and, for the three referred to, grants judgment in their favor accordingly, even though the fact is alluded to that such record title may have been for administrative convenience only.

This determination, presumably, would not be subject to constitutional attack and is, then, in that sense, not objectionable.

What is curious to me, however, is that under *Jones* v. *Wolf*—that is to say, insofar as constitutional integrity is concerned—the hierarchical approach would also be acceptable, but in the instant matter would require a diametrically opposite result, i.e., the result reached in the trial court.

Because that is the case, it seems to me essential both to appropriately justify the method used as well as to suggest reasons for rejecting the alternative mode of disposition.

The majority here accomplish the latter seemingly by virtue of the fact that the State of Georgia has availed itself of the neutral principles theory and upon the assertion *Presbytery of Riverside* v. *Community Church of Palm Springs* "places California law squarely in the neutral-principles camp." Without commenting on the persuasiveness of the first of these, it seems to me the second, if not inaccurate, is at least an overstatement.

Justification for use of the neutral principles approach is claimed additionally, because it is the most practicable method of resolving church property disputes. As I have indicated, whether that is so or not should depend on the circumstances.

The findings of fact of the trial court are supported with detailed and undisputed evidence with respect to every step of the long coexistence between the four parishes and respondents. Their relationship literally oozes the clear intention and ambition of each of the four parishes to severally achieve acceptance as a parish within the embrace of PECUSA with full knowledge that such acceptance meant the subordination of each to the constitution and canons of PECUSA and the transfer of the property of each to the Diocese of Los Angeles upon

dissolution or other means of disaffiliation. The fact that one of the parishes, Holy Apostles, in one of the documents executed to consummate its relationship with PECUSA crosses enough of the t's and dots enough of the i's to restore legal title to PECUSA or the Diocese upon the occurrence of such events does not warrant the nullification of a like requirement for the other three parishes when the record shows the intention of the parties was identical in all four cases.

As I see the question, if it appears conclusively that an express trust exists in favor of one or the other of the contending parties, the judgment must reflect that fact. Where, however, such does not affirmatively appear, there would seem to me to be little to recommend resolution of the question solely on the basis of bare legal title. The better choice in such an instance, in my view, is that approach which comes closest to recognizing those factors which define the nature of the relationship of the parties and therefore are best calculated to indicate what was contemplated by them in arriving at and agreeing upon that relationship. In the case at bench, if it is concluded no express trust affirmatively appears (a proposition I likewise do not accept), the hierarchical structure of PECUSA should be, as it was in the trial court, the controlling consideration.

Finally I am convinced none of the First Amendment rights of appellants have been violated. Each parish and its congregants are free to worship as they may from time to time decide at any place legally arranged for except the respective properties they now severally occupy. These properties they voluntarily and for a solid consideration agreed to transfer to PECUSA for use in accord with its constitution and canons.

I would affirm the judgment.

Petitions for a rehearing were denied March 2, 1981. Roth, P. J., was of the opinion that the petition should be granted. The petitions of appellant Holy Apostles Church and respondents for a hearing by the Supreme Court were denied April 22, 1981.