[No. B048755. Second Dist., Div. Seven. May 23, 1991.]

KOREAN UNITED PRESBYTERIAN CHURCH OF LOS ANGELES, Plaintiff, Cross-defendant and Respondent, v.
PRESBYTERY OF THE PACIFIC, et al., Defendants, Cross-complainants and Appellants.

484

**COUNSEL**

Latham & Watkins and Robert A. Long for Defendants, Cross-complainants and Appellants.

Masry & Vititoe, Arthur I. Weiss, Nancy S. Eichler and Edward L. Masry for Plaintiff, Cross-defendant and Respondent.

## OPINION

**WOODS (Fred), J.**— ■■■ ■■ Appeal by defendants and cross-complainants, bodies of the Presbyterian Church (U.S.A.), from a judgment (partial)[1] of the Los Angeles County Superior Court in favor of plaintiff, cross-defendant and respondent, Korean United Presbyterian Church of Los Angeles, the Honorable Dion G. Morrow, Judge presiding. Reversed.

### I.

### INTRODUCTION

On this appeal we are called upon to decide the central question of whether the trial court made its judgment awarding the subject church property to the Korean United Presbyterian Church of Los Angeles, then controlled by a dissident faction of the Presbyterian congregation to the detriment of a contending "exiled" faction of the same congregation, without violating First Amendment proscriptions against governmental involvement in religious matters, by the use of "neutral principles of law." An ancillary question to be decided is whether the acts of the dissident faction, which

---

[1]By stipulation, the trial proceeded on the first and second causes of action of the complaint to quiet title and for declaratory relief, respectively, and on the cross-complaint to enforce an express trust and for recovery of possession of real property. Trial of the additional causes of action of the complaint were bifurcated. The remaining and untried five causes of action of the complaint sound in fraud, violation of civil rights—racial discrimination, RICO (Racketeer Influenced Corrupt Organizations Act) fraud and conspiracy and for an injunction. The record is not clear under what statute the trial court was proceeding when it severed the trial of the causes of action as heretofore discussed, however, a reasonable inference is that the court utilized Code of Civil Procedure section 1048 (severance and consolidation of causes). Although facially the final judgment rule would seem to preclude this appeal, we are cognizant of a number of exceptions to the rule. We are also aware that the trial court has broad discretion under Code of Civil Procedure section 1048 and will not be reversed on appeal except for an abuse of discretion. The property issues bifurcated and tried are reasonably separate and independent from the remaining untried issues, and we therefore find no abuse of discretion and deem it appropriate to hear this appeal involving a partial judgment. (See *Schonfeld* v. *City of Vallejo* (1975) 50 Cal.App.3d 401, 418-419 [123 Cal.Rptr. 669].)

retained possession and control of the church premises while purporting to take governmental actions on behalf of the congregation after expulsion of the competing faction, are legally viable.

We conclude that the court could have and should have decided the case by utilizing "neutral principles of law," which as a matter of law would have mandated a judgment in favor of appellants in the trial court, but instead violated First Amendment proscriptions by the judgment that it ultimately made. We further conclude that the acts and measures taken and enacted by the faction retaining possession and control of the church premises and government were unlawful as a matter of law and of no legal effect. For the reasons hereafter discussed, the matter is reversed and remanded to the trial court with instructions to enter judgment for appellants as directed.

## II.

### OVERVIEW

Trial of this case proceeded upon the parties' stipulation to many of the facts, and the admissibility of most of the documents. During two days of trial, two witnesses were called by plaintiff; five by defendants. No significant evidentiary issues were argued; none are asserted as error on appeal. The testimony of all witnesses was largely uncontroverted.

At the core of this case are disputes regarding: (a) the ownership, use and control of church property; and (b) the governance and control of the nonprofit church corporation which, as agent of the church's congregation, holds its interest in that property.

Since the early part of this century, Korean United Presbyterian Church of Los Angeles (Church or KUPC) has been a local church and congregation in the national denomination now known as the Presbyterian Church (U.S.A.) (PCUSA). The Church has enjoyed a rich history as the oldest Korean immigrant congregation in the United States.

Presbytery of the Pacific (Presbytery), a governing body in PCUSA, originally helped to develop the Church congregation, acquired for the Church its first properties and secured financing for construction of a sanctuary and other buildings. Presbytery has actively worked with the Church for 80 years, securing pastoral leadership and giving other forms of support and encouragement.

In recent years, a schism developed within the Church congregation, primarily over the views and leadership of Rev. Sang Bom Woo, who served as pastor of the Church from 1975 until November 1988. While Presbytery worked for the reconciliation of Rev. Woo with the portion of the congregation he considered to be "dissidents," the reconciliation failed.

In July 1988, Rev. Woo began steps to disengage himself and his followers from PCUSA, while concurrently acquiring control of the plaintiff nonprofit corporation, which had been incorporated in 1945 to act as the Church's agent in the handling of its temporal affairs. The schism ultimately resulted in the purported dissident faction departing from the Church property. Since late 1988, this faction, estimated to encompass between 15 and 30 percent of the original membership, has been worshipping as a body and conducting the Church's activities in space provided by Emmanuel Presbyterian Church in Los Angeles, pending the outcome of this litigation.

Acting in accordance with the Book of Order, which sets forth the canon law and form of government for PCUSA and its constituent bodies, Presbytery designated the "exiled" congregation as the "true church." In its cross-complaint, Presbytery seeks to establish the right of the "exiled" congregation to be returned to the Church property to engage in worship, education and religious activities. This "true Church" congregation remains a part of Presbytery and PCUSA, as it has for over 80 years.

On December 1, 1988, Rev. Woo resigned from Presbytery, and on December 11, 1988, he persuaded his followers to vote for a withdrawal from PCUSA. Despite his resignation and their withdrawal, however, Rev. Woo and his followers continue to occupy the Church property to the exclusion of the "exiled" congregation which has been designated the "true Church" congregation by Presbytery.

The complaint in this action, alleging seven causes of action, was filed by Rev. Woo and his followers on behalf of the plaintiff corporation against PCUSA, Presbytery and the Synod of Southern California and Hawaii. Five causes of action were bifurcated at the outset of trial, with trial proceeding only on the first cause of action for quiet title to the Church property and the second cause of action for declaratory relief "that the Defendants have attempted, . . . to gain for itself [sic] title to the real property belonging to Plaintiff."

The cross-complaint, filed by Presbytery, alleges that the plaintiff corporation's right, title and interest in the Church property is held in trust for the

use and benefit of PCUSA, subject to the direction of Presbytery. In a first cause of action, Presbytery seeks to enforce this express trust on the Church property for the benefit of the "true Church" congregation, as designated by Presbytery. In a second cause of action, Presbytery seeks restitution of the Church property and a writ of possession directing that Rev. Woo and his followers be removed. Presbytery has also alleged that the complaint in this action was initiated and is prosecuted without proper corporate approval and authorization.

## III.

## SUMMARY OF MATERIAL FACTS

*Presbyterian Church (U.S.A.)*

Defendant PCUSA is a national religious denomination, the hierarchical church to which KUPC has always belonged. PCUSA was formed in 1983 upon the reunion of two predecessor denominations, the Presbyterian Church in the United States and the United Presbyterian Church in the United States of America. Prior to that reunion and change of name, KUPC was a part of the United Presbyterian Church in the United States of America.

PCUSA (and prior to the reunion, the United Presbyterian Church in the United States of America) is governed according to an ascending order of judicatories or governing bodies: church sessions, presbyteries, synods and the General Assembly. The government of the local church is committed to its session, composed of the ministers and ruling elders (laypersons who are ordained to the position of elder) of that church, the actions of which are subject to review by the next higher judicatory, the presbytery. A presbytery is the basic unit of presbyterian church government, composed of ministers and elders who represent all the particular churches in a certain geographic area and meet regularly as a legislative body. Presbyteries, in turn, are grouped under the jurisdiction of a synod, the next higher governing body. The highest judicatory is the General Assembly of PCUSA, which is composed of representatives elected by each presbytery.

In this case, KUPC and its pastor and congregation were under the jurisdiction of Presbytery of Los Angeles until 1968 when that presbytery was divided into five new presbyteries, one of which became Presbytery of the Pacific. The jurisdiction of Presbytery now includes the supervision and care of approximately 50 PCUSA churches, including KUPC. Presbytery is,

in turn, a part of and under the jurisdiction of defendant Synod of Southern California and Hawaii (Synod).

*The Book of Order*

PCUSA is organized and governed under a formal Constitution that consists of "The Book of Confessions" and "The Book of Order." One part of The Book of Order sets out the "Form of Government" applicable to PCUSA and all its connectional parts, including local churches, sessions, presbyteries, synods and General Assembly.[2]

The Book of Order has added significance in the case at bar—it is expressly referenced in plaintiff's articles of incorporation and in its corporate bylaws as the canon law to which the corporation is to be subject and is to adhere. The Book of Order governs both the Church, as an unincorporated religious body, and plaintiff, as the nonprofit corporation formed to conduct the Church's temporal affairs.[3]

The Book of Order empowers a presbytery, inter alia, to review the records of church sessions within its jurisdiction, redress the action of any session taken contrary to order and see that sessions observe the constitution of PCUSA. The presbytery alone has powers to organize new churches, receive and dismiss existing churches, and dissolve old churches, as well as to ordain, receive, dismiss, install and remove ministers. The presbytery may also appoint an administrative commission for a particular church and empower the commission to assume the original jurisdiction of the church's session.

Chapter VIII of the Book of Order sets forth provisions pertaining to "The Church and its Property," including paragraph G-8.0200, entitled "All Property Held in Trust:" as follows:

"All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, . . . *is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)."* (Italics added.)

---

[2]The Book of Order provides that: "Each particular church of the Presbyterian Church (U.S.A.) shall be governed by this Constitution."

[3]The Book of Order provides that the powers of the church corporation are subject to the authority of the session and to the constitution of PCUSA.

Paragraph G-8.0300, entitled "Property Used Contrary to Constitution:" provides:

"Whenever property of, or held for, a particular church of the Presbyterian Church (U.S.A.) ceases to be used by that church as a particular church of the Presbyterian Church (U.S.A.) in accordance with this Constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery."

Paragraph G-8.0600, entitled "Property of Church in Schism:" provides:

"The relationship to the Presbyterian Church (U.S.A.) of a particular church can be severed only by constitutional action on the part of the presbytery . . . . *If there is a schism within the membership of a particular church* and the presbytery is unable to effect a reconciliation or a division into separate churches within the Presbyterian Church (U.S.A.), *the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church within the Presbyterian Church (U.S.A.).* This determination does not depend upon which faction received the majority vote within the particular church at the time of the schism." (Italics added.)

*Korean United Presbyterian Church of Los Angeles*

In 1945, KUPC incorporated as a nonprofit California corporation for the purpose of holding and transferring property and conducting the Church's business affairs. At all times since 1945, KUPC's Articles of Incorporation, have included the following:

"SIXTH: That this Corporation shall be at all times subject and adhere to the doctrines and discipline of the Presbyterian Church in the United States of America [the predecessor of PCUSA].

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"EIGHTH: That all members of the above mentioned unincorporated association shall be members of this Corporation. That the admittance of any members, and the expulsion or suspension of members, shall be governed by the By-laws of the Corporation and the doctrines and discipline of [PCUSA]."

The "doctrines and discipline" include the Form of Government set forth in the Book of Order. KUPC's articles have been amended on only one occasion, in June 1979, when the name of the corporation was changed from Korean Presbyterian Church of Los Angeles to Korean United Presbyterian Church of Los Angeles.

The bylaws of the Church, as translated from the Korean language in which they are written includes these provisions:

"Article 3. This Church was established on May 10, 1905 and is a member church of the Presbytery of the Pacific of the United Presbyterian Church of the U.S.A. [the predecessor of PCUSA].

". . . . . . . . . . . . . . . . . . . . . . . .

"Article 62. As a general rule, any matter not provided for in these By-laws shall be determined in accordance with the Book of Order or the Presbyterian Law for the Local Church."

New bylaws were purportedly adopted by Rev. Woo and his followers in March 1989, long after they had initiated this lawsuit and had renounced membership in Presbytery and PCUSA.

*The Church Property*

The Church property consists of several separate lots, acquired over a period of 50 years and located generally at 1374 West Jefferson Boulevard, Los Angeles. Presbytery acquired the first of these lots in 1936 with contributions made to Presbytery for this purpose. The second lot was bought in 1937, also with contributions to Presbytery. Presbytery acquired title to both lots solely in its name and provided them for the KUPC congregation as the location of its first Church property. The first church buildings, completed in 1938, were financed by gifts made to Presbytery for its "Presbyterian Korean congregation" and from monies borrowed by Presbytery from the Board of National Missions of the Presbyterian Church in the United States of America.

Since 1936 and 1937, Presbytery has held title to these first Church properties solely in its name. While title has never been held in the name of KUPC, either as an unincorporated association or a nonprofit religious corporation, the KUPC congregation has used and occupied the property as a particular church of PCUSA from 1938 until November 1988.

As the Church grew in the 1970's, it acquired additional lots to meet its need for expanded facilities. In 1982, the Church embarked upon a building program that included the construction of a new sanctuary and parking lot. To assist in the financing of these improvements, the Church made application through Presbytery for loans totalling $200,000 from the Synod of Southern California and Hawaii and from the General Assembly of PCUSA. The Synod and General Assembly approved loans to KUPC of $75,000 and $125,000, respectively, in 1983. As a condition of its loan, General Assembly asked Presbytery to be the primary obligor on the loan documents and to hold title to all the Church property for as long as the loans were outstanding. Both Presbytery and KUPC agreed to this arrangement.

On July 14, 1983, KUPC executed a grant deed conveying to Presbytery all the Church property, except for the original two lots that Presbytery had acquired in 1936 and 1937. Those lots were already held in the name of the Presbytery; however, since they were initially acquired in the name of the old Presbytery of Los Angeles, the Synod, acting on behalf of that Presbytery, executed a grant deed to the lots in favor of Presbytery of the Pacific, to clarify the chain of title.

As security for the loans of $75,000 and $125,000, Presbytery executed deeds of trust in favor of the Synod and PCUSA. When these trust deeds and the grant deeds executed by KUPC and Synod were recorded, the loans were funded. The principal amount of the loans, $200,000, is still outstanding. In 1988, Rev. Woo and his followers attempted to refinance these loans through a commercial bank, without first seeking Presbytery's approval or obtaining the authorization of the Church's session or congregation. Presbytery's refusal to condone Rev. Woo's refinancing plan and its insistence that the plan be first approved by the Church session precipitated this lawsuit.

*Control of the Church and the Non-profit Corporation*

All witnesses at trial agreed, and the trial court found, that the ruling body of KUPC, as an unincorporated religious body, was its session, which normally consisted of KUPC's pastor and the ruling elders elected by the congregation.

The Book of Order provides that the "session of a particular church consists of the pastor . . . and the elders in active service" and that the "session is responsible for the mission and government of the particular church." The nonprofit religious corporation formed to hold the Church's

property and deal with its business affairs was accountable to the religious body through the session.

KUPC's session also served as the governing board of the nonprofit religious corporation, and it alone had authority over the plaintiff corporation's affairs. KUPC's corporate bylaws placed this authority in the session:

"Article 36. The Session shall have all responsibility for the administrative affairs of this Church, [and] shall supervise all business and activities of the Church . . . ."

In approximately 1985, several members of the Church lodged complaints with Presbytery about contentions and divisions existing within the congregation and about the leadership of Rev. Woo. Acting in accordance with the Book of Order, Presbytery appointed, on June 28, 1986, an administrative commission to review these complaints and to work to bring reconciliation within the congregation. Presbytery also appointed Rev. James H. Morrison as chair of the administrative commission and empowered him to assume the position of moderator of KUPC's session. Rev. Morrison began his leadership almost immediately, and KUPC's elders submitted to his authority as moderator. Rev. Morrison served in this capacity (and thus as chair of the plaintiff corporation's board) from October 1986 until November 1988.

Under the Book of Order, session meetings could be validly conducted only with the moderator in attendance and under his authority. The session could not act without its moderator, and no official action on behalf of the Church could be taken without action of the session. Rev. Woo followed this principle of church and corporate governance until July 1988. Under the Book of Order, the congregation possessed only limited authority to conduct business, and nothing in KUPC's articles or bylaws purported to grant the congregation any greater powers.

The last regular meeting of KUPC's session occurred in June 1988, when the session concluded that to help bring harmony within the congregation, the Church should expand the size of its session to nine elders. The session called and duly noticed a congregational meeting for July 31, 1988, to vote on the increase in the number of elders and to elect elders to the new position. Under KUPC's bylaws, and under the Book of Order, Rev. Morrison, as moderator of session, was to chair the congregational meeting.

On July 31, Rev. Woo and his faction were successful in obtaining control of the congregational meeting, effectively preventing Rev. Morrison from

chairing the proceedings, denying him the right to speak and ignored the stated purpose and scheduled agenda of the meeting. Rev. Woo proceeded to pursue another agenda. Among other things, he introduced plaintiff's counsel, who addressed those in attendance and maintained that the Presbytery had taken the Church's property through fraud and discrimination.

The June session meeting was the last which Rev. Morrison moderated; and the July congregational meeting was the last he attempted to chair. No meeting of the KUPC session was held between August 1, 1988, and November 8, 1988.

At its regular meeting held on November 8, 1988, Presbytery voted to remove the session of the Church and Rev. Woo as its pastor, effective immediately. Presbytery also appointed a new administrative commission and empowered it to assume the original jurisdiction of KUPC's session and to fulfill the session's responsibilities on all matters. None of these actions of Presbytery were appealed, although the Book of Order provides for a right of appeal. Rev. Woo and his faction were advised of that right, but took no action.

Since November 1988, the new session appointed by Presbytery has worked actively on behalf of the "true church" congregation, which continues to worship away from the Church property at Emmanuel Presbyterian Church. The new session continues to express a desire to return the true congregation to the Church property; it has never authorized the filing or prosecution of the complaint in this case or any refinancing of the Church property.

On December 1, 1988, Rev. Sang Bom Woo resigned and withdrew from membership of Presbytery, and the faction represented by Rev. Woo voted to renounce their membership in PCUSA. This lawsuit was initiated on the same date.

*Judgment of the Superior Court*

In its statement of decision, filed January 8, 1990, the superior court found that (a) plaintiff KUPC "is the owner of and entitled to the entire beneficial interest in, and possession of, each of the parcels of the subject real property"; (b) the 1983 grant deeds are, in effect, a mortgage securing the $200,000 in loans from Synod and PCUSA, requiring defendants to reconvey the property upon repayment of the loans; (c) the lots acquired in 1936 (and 1937) in the name of Presbytery and held in its name since that time are

held by it in trust for plaintiff KUPC; and (d) under the principles set forth in *Protestant Episcopal Church* v. *Barker* (1981) 115 Cal.App.3d 599 [171 Cal.Rptr. 541], there is "no legally enforceable trust, either express or implied, as to the use or maintenance of said church property in favor of [PCUSA or Presbytery]."

The decision of the superior court did not address the issue concerning who validly controls the plaintiff nonprofit corporation, i.e., Rev. Woo's followers who have left the denomination or the current session that seeks to preserve it for the designated "true Church." Further, the court did not decide for whose benefit the plaintiff nonprofit corporation holds its property interests, i.e., Rev. Woo's followers or the designated "true Church" congregation which seeks to return to the Church property. The court, however, expressly discussed these issues in its statement of decision as follows:

"The issues simply are, which body of that divided church will be in possession and control, and is the church bound by the provisions of Book of Order. Put another way, the question is whether the majority of the membership of the church has the power to control its destiny and its religious affiliation while maintaining the ownership and possession of its property, or whether the Presbytery and PC U.S.A. have the right to select a minority of the membership to occupy and own the property as the 'True Church.' " The court never *expressly* decided these issues. However, the court's judgment is impliedly premised upon the legal conclusions, albeit tacit ones, that Rev. Woo and the faction he represents are entitled to control the corporation for their own purposes (since the trial court left them in apparent control) and that the Presbytery's determination of the "true church" is entitled to no deference (since the trial court left Rev. Woo and his followers in possession of the property).

## IV.

### ISSUES PRESENTED ON APPEAL

Appellants formulate the following issues to be decided on this appeal:

A. Did the trial court err when it failed to give deference to the determination made by Presbytery as to which of two factions of Korean United Presbyterian Church was entitled to the use and enjoyment of the Church property?

B. Did the trial court err when it failed to address the issue of corporate control and governance of the plaintiff nonprofit corporation and failed to

conclude, as a matter of law, that seizure of this corporation by Rev. Woo and his followers was unlawful and that their actions taken in the corporation's name were without corporate authorization and invalid?

C.  Did the trial court misapply the principles of Corporations Code section 9142 and *Protestant Episcopal Church v. Barker, supra,* 115 Cal.App.3d 599 when it found no enforceable trust as to the Church property for the use and benefit of PCUSA?

As discussed hereafter, we find that the superior court committed errors of law in all three instances.

V.

DISCUSSION

A.  *The Legal Principles Applicable to Church Property Disputes*

In early 1981, the California Court of Appeal for the Second Appellate District filed its opinion in *Protestant Episcopal Church v. Barker, supra,* 115 Cal.App.3d 599, certiorari denied 454 U.S. 864 [70 L.Ed.2d 163, 102 S.Ct. 323], containing not only the latest, but the most definitive appellate consideration of the legal principles concerning church property disputes in California.

The *Protestant Episcopal* case arose as a result of a doctrinal controversy within the Protestant Episcopal Church in the United States of America involving, among other things, the ordination of women as priests. Four Los Angeles Episcopal churches seceded from their regional and national affiliation with the Episcopal Church, but retained possession and control over local church property which stood in the names of local church nonprofit corporations. The national denomination brought four separate actions to obtain title and possession of the property of the seceding churches. The issue in each case was simply whether the local church organization was entitled to keep its church property standing in its own name, or whether it was to surrender the property to the regional or national church organization as property held in trust for the general church membership. (115 Cal.App.3d at pp. 604-605.) There was no issue of schism within any of the four congregations and no question about control of the nonprofit corporations which held title.

The Court of Appeal surveyed and analyzed three alternative theories— hierarchical, implied trust and express trust—which courts have historically

applied to resolve disputes involving church property and focused its analysis through the utilization of three recent appellate opinions. (115 Cal.App.3d at pp. 611-624.)

The first was *Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601], where the United States Supreme Court held that the First Amendment bars a civil court from adjudicating church property litigation through its own resolution of controversies over religious doctrine, practice or polity in the following language:

"[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are *neutral principles of law, developed for use in all property disputes*, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." (393 U.S. at p. 449 [21 L.Ed.2d at p. 665].) (Italics added.)

The second opinion cited by the Court of Appeal was the more recent, and latest, United States Supreme Court case in this area, *Jones* v. *Wolf* (1979) 443 U.S. 595 [61 L.Ed.2d 775, 99 S.Ct. 3020]. The issue there, similar to that in the instant case, was which faction of a previously united congregation was entitled to possess and enjoy church property. The court described the legal question as "whether civil courts, consistent with the First and Fourteenth Amendments to the Constitution, may resolve the dispute on the basis of 'neutral principles of law,' or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church." (*Id.* at p. 597 [61 L.Ed.2d at pp. 780-781].) The majority opinion expressly approved the use of neutral principles of law with this discussion:

"The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary

clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy." 443 U.S. at p. 603 [61 L.Ed.2d at p. 785].) The majority also noted, however, that separating civil from ecclesiastical issues in church disputes is a difficult task, and warned civil courts not to intrude into ecclesiastical matters in the following language:

"Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice. [Citations.] As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization." (443 U.S. at p. 602 [61 L.Ed.2d at p. 784].)

The conclusion to be drawn from *Jones* is that a state court may resolve disputes over church property through use of neutral principles of law, focusing on sources such as deeds to church property, articles of incorporation, bylaws, state statutory law and the constitution and rules of the general church; but if the civil court is required to resolve a religious controversy, it must then defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

The third opinion focused on by the Court of Appeal in the *Protestant Episcopal Church* case was *Presbytery of Riverside* v. *Community Church of Palm Springs* (1979) 89 Cal.App.3d 910 [152 Cal.Rptr. 854], which was decided before the opinion in *Jones*. In *Presbytery of Riverside*, the California Court of Appeal accepted the United States Supreme Court's invitation to resolve church property disputes through application of neutral principles of law. In that case, a local church, which had incorporated a nonprofit corporation to hold title to its church property, withdrew from the national denomination. The denomination sued to obtain ownership and possession of the local church property, relying almost solely on rules of the general church providing that whenever a local church was formally dissolved or abandoned, its property was to revert to the denomination. Applying what it considered to be "neutral principles," the court rejected the contention that property of a local church which is part of a general hierarchical church is, as a matter of law, held in trust for the benefit of the general church. (*Id.* at pp. 925-929.) Focusing instead on bare title to the property, the court upheld the trial court's ruling that ownership and possession of the disputed church property remained with the local church. (*Id.*, at pp. 923, 933.)

However, at the same time, the court affirmed long established California precedent that " 'whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest . . . church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.' " (89 Cal.App.3d at p. 919.) According to the court, " 'First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.' " (*Id.* at p. 920.)

■ Relying on principles articulated in these three opinions, the Court of Appeal, in *Protestant Episcopal Church* v. *Barker, supra,* 115 Cal.App.3d 599, 611-620, held that the hierarchical and implied trust theories were inconsistent with the precept of neutral principles of law as a basis for resolution of church disputes. The court approved the third theory, that of express trust, which "relies on title deeds, articles of incorporation, canons and rules of the organizations concerned and statutes, to establish that a local church holds property under an express trust for the benefit of the general church membership as embodied in its regional and national organizations." (*Id.* at p. 606.)

B. *The Superior Court Erred in Failing to Hold That the True Korean United Presbyterian Church, as Identified by Presbytery, Was Entitled to the Church Property*

The superior court's conclusion that the plaintiff nonprofit corporation "is the owner of and entitled to the entire beneficial interest in, and possession of, each of the parcels of the subject real property," stopped short of addressing two key issues in this case. The key issues are: (1) for whose benefit does the corporation hold such property interest, and (2) who controls the corporation? Nevertheless, the court's judgment left Rev. Woo and his faction in possession of the Church property and in apparent control of the corporation. Thus, in rendering its judgment, the court, in effect, substituted its own judgment for the previous determination made by Presbytery on a matter of religious doctrine and polity—the identity of the true Church congregation. On this point, the court erred as a matter of law. The court also erroneously disregarded defendants' contention, and the undisputed evidence in the record that supports it, that control of the nonprofit corporation had been unlawfully obtained. Under neutral principles of law applicable to the governance of nonprofit corporations, the only valid and lawful actions of the corporation have been those which seek to return possession of the Church property to the true Church congregation.

*1. The decision of the superior court violates the First and Fourteenth Amendments by substituting the court's judgment for the judgment of Presbytery regarding the identity of the particular church entitled to use and enjoy the Church property, a question of church doctrine and polity.*

■■■ While the opinions in *Presbyterian Church, Jones, Presbytery of Riverside,* and *Protestant Episcopal Church* support the use of neutral principles of law to resolve church property disputes, they also mandate that on ecclesiastical issues, including matters of religious doctrine or polity, civil courts must defer to the highest judicatory of the hierarchical church hearing and addressing the matter.

PCUSA is a denomination with a hierarchical polity. The church is governed with rising tiers of authority, the lower being subordinate to the higher; this is clearly shown by the following portions of the Book of Order:

"A higher governing body [i.e., PCUSA] shall have the right of review and control over a lower one and shall have power to determine matters of controversy upon reference, complaint or appeal;

"The nature of Presbyterian order is such that it shares power and responsibility. The system of governing bodies, whether they have authority over one or many churches, sustains such mutual relationships within the structures as to express the unity of the church."

Further, under the Book of Order, the identity of a particular church in PCUSA is a matter of both religious practice and government:

"A particular church consists of those persons in a particular place, along with their children, who profess faith in Jesus Christ as Lord and Savior and who have been gathered for the service of God as set forth in Scripture, subject to a particular form of church government.

"Each particular church of the Presbyterian Church (U.S.A.) shall be governed by this Constitution."

It has long been the law in California that the identification of a religious body as the true church is an ecclesiastical issue. (See *Presbytery of Riverside v. Community Church of Palm Springs, supra,* 89 Cal.App.3d at p. 922, citing *Horsman* v. *Allen* (1900) 129 Cal. 131, 135 [61 P. 796].) In *Wheelock* v. *First Presb. Church* (1897) 119 Cal. 477 [51 P. 841], a church congregation divided into two factions, with one faction petitioning the governing

Presbytery to divide the congregation into two and to make an equitable division of a fund of money accumulated to purchase new church property. The Presbytery did so, and the court upheld the action, indicating that the division of the church into two congregations was an ecclesiastical matter:

"But the ecclesiastical court known as the Presbytery had the power to deal with the First Presbyterian Church in all matters ecclesiastical. The church as an ecclesiastical body was under the absolute control and dominion of the Presbytery, and the decisions and decrees of that body were as binding upon it as the decisions and decrees of this court are binding upon inferior judicial tribunals. Those decrees are not only binding upon the church as an ecclesiastical body, but they are *binding and conclusive upon courts wherever and whenever* material to pending litigation." (Italics added.) (119 Cal. at p. 482.)

The principal purpose of the legal action in *Horsman* v. *Allen, supra*, 129 Cal. 131, was to determine the respective rights of parties to the use and control of two tracts of lands. The determining question was which of two sets of trustees elected by religious bodies, both claiming to represent the true church, was entitled to the property:

"The sole question, therefore, is as to the identity of the church. If the radical is the true church, the plaintiffs are entitled to recover; otherwise not." (129 Cal. at p. 135.) For the answer to this question, the Supreme Court deferred to the decision made by the highest judicatory in the denomination. (See also *Presbytery of Riverside* v. *Community Church of Palm Springs, supra*, 89 Cal.App.3d at p. 922, where the court called this question in *Horsman*, "clearly ecclesiastical.")

These California decisions are consistent with the constitutional mandate of the United States Supreme Court that civil courts may not overrule actions of authorities of hierarchical denominations with respect to matters of church polity.

In *Kedroff* v. *St. Nicholas Cathedral* (1952) 344 U.S. 94 [97 L.Ed. 120, 73 S.Ct. 143], the Supreme Court held that a New York state court could not constitutionally substitute its judgment for the judgment of the Moscow-based authorities of the Russian Orthodox Church with respect to which church official was entitled to occupy and to control the use of Saint Nicholas Cathedral in New York City. (See also *Kreshik* v. *St. Nicholas Cathedral* (1960) 363 U.S. 190 [4 L.Ed.2d 1140, 80 S.Ct. 1037] [The state may not by legislation transfer hierarchical control of a denomination, and thus control over church property, from one group to another.].)

Also, in *Serbian Eastern Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d 151, 96 S.Ct. 2372], the Supreme Court held that the Illinois Supreme Court could not constitutionally substitute its judgment for the judgment of the Holy Assembly of Bishops and the Holy Synod of the Serbian Orthodox Church with respect to who was to be the bishop of the American-Canadian Diocese with control over the diocesan property, and concluded as follows: "In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." (*Id.* at pp. 724-725 [49 L.Ed.2d at p. 171].)

In the instant case, the Book of Order provides that where a schism exists within the membership of a particular church and no reconciliation or division is possible, "the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the true church."

■ The trial court correctly concluded that Presbytery, in accordance with the Book of Order, had made such a determination, but then failed to defer to that decision. Presbytery had determined that the faction which was excluded from the property and now gathers at Emmanuel Presbyterian Church is the "true Church," but the trial court substituted its own judgment for that of the Presbytery by leaving Rev. Woo and his faction in possession of the church property.

It is immaterial that the faction which Presbytery has designated as the true church is a minority of the original membership. The Book of Order says that the "determination does not depend upon which faction received the majority vote within the particular church at the time of the schism."

In *First English E. L. Church* v. *Dysinger* (1932) 120 Cal.App. 139 [6 P.2d 522], a schism arose within the congregation, resulting in conflicting claims to the church's property. The majority of the members, the former officials of the church and the pastor claimed the right to hold the church property as against the minority and higher governing bodies of the denomination. The appropriate hierarchical judicatory rendered an opinion in favor of the minority members of the congregation, and the Court of Appeal declined to review that decision of the authorized tribunals of the church or to substitute its own. In so concluding, the court found it "immaterial whether the

plaintiffs constitute a large or small minority of all the members of the church, . . ." (*Id.* at p. 148.)

The Presbytery was the authoritative ecclesiastical body charged with the responsibility of determining which of the two factions of KUPC was the "true church." It did so, and its decision became binding and conclusive on the trial court. On this basis alone, the congregation designated by Presbytery as the true church became entitled to the use and enjoyment of the Church property. Thus, the trial court erred in denying the relief sought in the defendants' cross-complaint, which asked for restitution of the property for the true congregation and ejectment of Rev. Woo and his faction.

2.   *Under neutral principles of law, the trial court was required to conclude that the obtaining of control of the nonprofit corporation was unlawful and that the nonprofit corporation's only valid actions have been those seeking to return possession and use of the Church property to the true Church congregation.*

Having first erred by disregarding the First Amendment mandate to defer to Presbytery's determination regarding the true Church congregation entitled to possession of the church property, the trial court compounded the error by proceeding to make its own determination and failing to apply neutral principles of corporate governance to the undisputed facts before it.

The California Nonprofit Religious Corporation Law (Corp. Code, § 9110 et seq.) requires that the activities and affairs of a religious nonprofit corporation, like KUPC, be conducted and its corporate powers exercised under the direction of its board, subject to the provisions of the Corporations Code and to "any provision in the articles or bylaws." (Corp. Code, § 9210.)   The articles and bylaws of a corporation constitute rules of law adopted for its internal governance " 'to regulate the conduct and prescribe the rights and duties of its members towards itself and among themselves in reference to the management of its affairs.' " (*Olincy* v. *Merle Norman Cosmetics, Inc.* (1962) 200 Cal.App.2d 260, 267 [19 Cal.Rptr. 387].)

For religious nonprofit corporations, bylaws may partly be prescribed by, and may be an important tie to, a related superior or affiliated religious organization. The definition of the term "bylaws" as used in the religious nonprofit corporation law includes "the code or codes of rules used, adopted, or recognized for the regulation or management of the affairs of the corporation irrespective of the name or names by which such rules are

designated." (Corp. Code, § 9150, subd. (a).) One commentator described this provision of the religious nonprofit corporation law as follows:

"This approach in the Religious Corporation Law is designed specially to permit bylaws of a religious corporation to include other types of rules and regulations to be found in various religious documents such as canons, constitutions, or rules of other religious bodies; church traditions if sufficiently ascertainable; rules of a religious superior; and similar sources." (1B Ballantine & Sterling, Cal. Corporation Law (4th ed. 1990) § 418.04, at p. 19-493.)

When plaintiff nonprofit corporation was formed in 1945, its articles of incorporation made clear that it would be "at all times subject and adhere to the doctrines and discipline of the Presbyterian Church in the United States of America [now PCUSA]," and that its membership would be determined in accordance with such "doctrines and discipline." With these provisions, the articles tied governance of the plaintiff corporation directly to the constitution of PCUSA and its Book of Order, setting forth the form of government for the Church. Article 62 of the corporation's bylaws made that tie even stronger by expressly designating the Book of Order and the *Presbyterian Law for the Local Church* as rules of governance for any matters not otherwise provided in the bylaws. Clearly, the plaintiff corporation, like the church congregation for which it serves as agent in temporal affairs, has been subject to the rules of government set forth in the Book of Order.

In accordance with both the corporate bylaws and the Book of Order, the KUPC session, as the governing body of the Church congregation, also serves as the board of the nonprofit corporation; and the moderator of session serves as chair of the corporate board. Under the bylaws and the Book of Order, the session is empowered to conduct all the administrative and business affairs of the corporation; the membership of the congregation is empowered only to elect officers, call a new pastor, fix the terms of a pastoral call or buy, mortgage, or sell real property. Without its moderator or chair in attendance, neither the session nor the congregation has the power to conduct meetings or to engage in the corporation's business; the moderator possesses exclusive authority to convene, conduct and moderate over lawful meetings of the session or the congregation. Under the bylaws and the Book of Order, the business to be transacted at a special meeting of the congregation is limited to items specifically listed in the call for the meeting, and under the Book of Order, meetings of the congregation can be called only by the session or Presbytery.

At its regular meeting in June 1988, the KUPC session acted to recommend to the congregation that the session be expanded to nine members. The session called a special meeting of the congregation to amend the corporate bylaws to increase the size of the board and to vote the election of new elders for those positions. No other items appeared on the notice or agenda of the meeting.

The July 31, 1988, special meeting of the congregation did not occur as noticed. Rev. Morrison, the moderator of session, was not permitted to conduct or moderate the meeting; he was asked to leave. Rev. Woo and his faction supplanted Rev. Morrison, but their actions had no authority under the articles, bylaws or Book of Order. A moderator may be replaced in only limited circumstances, none of which were present at KUPC's congregational meeting of July 31, 1988, and none of which include coercion.

No further meetings of the session or the congregation occurred between July 31, 1988, and November 8, 1988, when Presbytery, by vote of its members, elders (laypersons) and other pastors, removed Rev. Woo as pastor of the church,[4] removed the old session, appointed a new administrative commission and empowered that commission to act in all respects as the session of the Church. With that action, Rev. Woo's relationship with KUPC was terminated and any continuing authority of the old session came to an end. Since that date, the new session has acted as the duly constituted corporate board and has undertaken remedial steps to remove Rev. Woo and his faction from the Church property and to restore the Church property to the use and benefit of the true congregation.

KUPC's session never authorized the complaint in this action. None of the actions taken by Rev. Woo and his faction, beginning with the removal of Rev. Morrison as moderator of the congregational meeting in July 1988, and including the retention of counsel to sue the Presbytery and PCUSA, the initiation of this lawsuit and the effort to refinance the Church property, was ever authorized by the session. All such actions are therefore invalid. The only valid actions were those taken by the new session after November 8, 1988, including its decision to return possession and use of the Church property to those determined by Presbytery to be the true congregation.

It is immaterial that Rev. Woo and his faction purported to amend the corporate bylaws in March 1989 to break the Church corporation's ties to the

---

[4]Under the Book of Order, a church pastor is a member of the presbytery which calls him to serve a congregation; he is not a member of the congregation itself; and his relationship with the congregation is dependent on approval of Presbytery and his adherence to the Book of Order.

rules of governance set forth in the Book of Order. They had no authority to take these steps. Firstly, four months earlier, in December 1988, Rev. Woo had resigned from Presbytery, renounced the jurisdiction of PCUSA over him and persuaded his followers to vote to leave PCUSA. At that moment, if not before, these members had renounced any further obligation to be subject to the doctrines or discipline of PCUSA, and, in effect, renounced their membership in the plaintiff nonprofit corporation, since its articles of incorporation required adherence to the doctrines and discipline of PCUSA as a condition of membership. Having abandoned their membership in the plaintiff corporation, they lost all power and ability to determine its future status. Secondly, no meeting of the session of congregation was validly called or conducted to consider such action. Thirdly, under the Book of Order, the relationship of a particular church to PCUSA can be severed only by action on the part of Presbytery.

For these reasons, the court erred when it failed to apply "neutral principles" of nonprofit corporation law to find (1) that the obtaining of control of the plaintiff corporation by Rev. Woo and his faction was unlawful, (2) that the prosecution of this lawsuit by Rev. Woo and his followers on behalf of the corporation has been invalid, (3) that the new session appointed by Presbytery on November 8, 1988, is in lawful control of the corporation and (4) that the actions of the new session to return the Church property to the true Church congregation should be enforced judicially.

C. *The Trial Court Erred in Failing to Find That the Church Property Was Held in Express Trust, for the Use And Benefit of the Denomination, Which Has Determined That the True KUPC Congregation Shall Continue to Use the Property*

The judgment below is reversible on either of the grounds discussed above, either of which would return possession and use of the Church property to the true KUPC congregation. Additionally, neutral principles of law compel the conclusion, as a matter of law, that the Church property was held in trust for the use and benefit of PCUSA, which through action of Presbytery has determined that the true KUPC congregation shall have the use and enjoyment of the Church property. The trial court erroneously misapplied the neutral principles of property law applicable to this case.

When the Court of Appeal, in *Protestant Episcopal Church* v. *Barker*, *supra*, 115 Cal.App.3d 599, decided to apply neutral principles of law to resolve the church property disputes before it, it identified and discussed "four general sets of facts" for determining the presence or absence of an express trust in church property.

The first set of facts looks to the *deed and title to the property*. Pertaining to this factor, the court simply noted that where the local body holds property in its own name, without more, the national body may have little basis to claim that the property is held in trust and cited Evidence Code section 662 and Civil Code section 1105. (115 Cal.App.3d at pp. 621-622.)

The second set of facts involves the *articles of incorporation and other organizational documents* of the local church. Here, the court noted that where the organizational documents show that a church is incorporated and identified as an integral part and a subordinate body of a national denomination, neutral principles of law may dictate that it hold its property in trust for the national body. (115 Cal.App.3d at pp. 622-624.)

The third set of facts deals with the *constitution, canons and rules of the general church*. Here, the court stated that where the governing rules of a national body expressly provide that a local church holds its property in trust for the benefit of the general church, it will give deference to those provisions. (115 Cal.App.3d at p. 624.)

Indeed, a few years earlier, the United States Supreme Court in *Jones* v. *Wolf, supra*, 443 U.S. 595, had invited religious denominations to add such language to their constitutions to ensure that civil courts would rule uniformly on property disputes in which a particular local church might find itself embroiled by stating that: "At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." (*Id.* at p. 606 [61 L.Ed.2d at p. 786].)

The fourth set of facts in *Protestant Episcopal* arises from *California statutory law*. Here, the court looked particularly to California Statutes 1939, chapter 148, page 1262, which, for the first time in California, authorized the incorporation of a subordinate body to a national body and provided that whenever the charter of the subordinate body is surrendered to, taken away or revoked by the national body granting it, the property of the subordinate body is to be delivered to the national body and disposed of in accordance with the laws of that body. (*Protestant Episcopal* v. *Barker, supra*, 115 Cal.App.3d at p. 624.) The court stated that if a church incorporated after

1939 makes a specific statement in its articles of incorporation about the church's relationship to a national church, then "under neutral principles of law reference to these statutory provisions is relevant to any determination of express trust." (*Ibid.*)

Applying "the four general sets of facts" to the circumstances surrounding the four local Episcopal churches which were parties to the *Protestant Episcopal Church* appeal, the Court of Appeal concluded that no express trust was created in the property of three of the churches which "held title to their property in their own names, paid for it out of their own funds, did not alienate it in any express manner in their articles of incorporation, and did not subject themselves to express restraints on their property by reason of the constitution, canons, and rules of PECUSA and the Diocese." (115 Cal.App.3d at p. 625.) However, the court found that the fourth church, Holy Apostles, *did* hold title to its property subject to an express trust in favor of the Diocese, since that church was specifically identified in its articles as a subordinate body of the national body and the Diocesan canon declared that on dissolution of a church, its property should revert to the Diocese. (*Id.* at pp. 625-626.)

Since *Protestant Episcopal Church*, there have been no further California appellate or United States Supreme Court opinions dealing with the "neutral principles" applicable to church property disputes. However, the California Legislature has taken action. In an effort to bring greater clarification to the question of when assets of a religious corporation are impressed with a trust for the general purpose of the denomination, the Legislature amended Corporations Code section 9142, effective January 1, 1983, to provide presumptive rules for religious trusts. (Stats. 1982, ch. 242, § 1, p. 784; see 1B Ballantine & Sterling, Cal. Corporation Law, *supra*, § 418.01[3][c] at p. 19-476.) Corporations Code section 9142, subdivision (c)(2) now provides that a trust is presumed in religious assets "to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body or general church *of* which the corporation is a member, so expressly provide." (Italics added.)

*1. Corporations Code section 9142, subdivision (c)(2) creates a presumption of a trust in the Church property.*

Plaintiff nonprofit corporation was incorporated as an integral part and as a subordinate body of the Presbyterian Church in the United States of America, which later became PCUSA. Its articles recite that the corporation "shall be at all times subject and adhere to the doctrines and discipline" of PCUSA; its bylaws memorialize the Church's membership in the Presbytery,

a part of PCUSA; and its bylaws require that the corporation conduct itself in accordance with the Book of Order.

According to appellant, after the United States Supreme Court made its decision in *Jones* v. *Wolf, supra,* 443 U.S. 595, PCUSA determined that it would follow the majority opinion's invitation and expressly state in the Book of Order its traditional understanding of the nature of ownership of church property in a manner that civil courts would follow. In 1981, the General Assembly adopted the amendments now set forth in chapter VIII, entitled The Church and Its Property:

"All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)."

These provisions were carried forward into the Book of Order at the reunion of the United Presbyterian Church in the United States of America and the Presbyterian Church of the United States, to form the new PCUSA. This new Book of Order was enacted by vote of all PCUSA presbyteries, 52 to 8, with Presbytery of the Pacific, of which KUPC was a member, voting in favor. The Presbytery's affirmative ballot resulted from an earlier vote of the members of the Presbytery, pastors and elders in equal number, including the pastor and an elder of KUPC. Rev. Woo and elders of KUPC regularly participated in meetings of the Presbytery. Further, Rev. Woo was familiar with the Book of Order provisions regarding property and recognized the impact they had on property held by KUPC.

The trial court erred in its failure to apply Corporations Code section 9142, subdivision (c)(2) to the facts of this case. In determining the presence or absence of a trust in the Church property, the trial court erred by not applying the presumptive rules in section 9142, subdivision (c)(2) that the property was held in trust for the use and benefit of PCUSA.

2. *The title and deeds support a finding of a trust.*

Consideration of the "four general sets of facts" articulated by the court in *Protestant Episcopal Church* to the facts of this case, extends the presumption provided in section 9142, subdivision (c)(2) to a clear finding of an express trust. The trial court misapplied these four factors to the

undisputed facts of this case. The court improperly looked at each of the factors separately to see if an express trust was present in any one of them. However, the court, as a matter of law, should have looked at these factors collectively, asking whether under the totality of the circumstances, they required a finding of express trust.

■■■ On the first of these factors—title and deeds to the Church property—the trial court erroneously ignored the undisputed fact that title to two of KUPC's lots had been held solely in the name of the Presbytery since 1936 and 1937. At one point in its decision, the court suggested that these lots were held by Presbytery as part of the 1983 loan transaction. In fact, these two lots were not the subject of plaintiff's 1983 grant deed to Presbytery in connection with the $200,000 loan transaction because title had already been held by the Presbytery for almost 50 years. The fact that it has held title for 50 years is a factor which supports a finding of express trust, particularly in light of the other factors discussed below.

In considering this factor, the trial court apparently gave no weight to the long history of the Church as part of PCUSA. The court discounted the fact that the property had been held in the name of the Presbytery for over 50 years on the ground that "there simply is no doubt whatsoever but that it was always the intention of all the parties that the subject land be owned and occupied by a Korean Presbyterian Church." The record is devoid of evidence that the parties always intended the property to be used and occupied by "a" Korean Presbyterian Church; all the evidence pointed to "the" Korean United Presbyterian Church, a member church of PCUSA. The entire history of these properties supports this conclusion.

### 3. The articles and bylaws support a finding of a trust.

The trial court concluded, as a legal matter, that the corporate articles and bylaws of KUPC "contain no provision of express trust." However, the *Protestant Episcopal Church* opinion does not require that there be a "provision of express trust" in those documents; the Court of Appeal looked to those documents only as one of the facts that could support a finding of express trust. In the case of KUPC's articles and bylaws, that support is clear and persuasive.

Plaintiff's articles of incorporation recite that the corporation "is organized under the provisions of Article I, of Title XII, of Part IV, of Division First, of the Civil Code of the State of California," which, in 1945, was California's nonprofit corporation law. This portion of the Civil Code included section 605dd, which provided as follows:

"Whenever the charter of a subordinate body which has been incorporated pursuant to the provisions of this article is surrendered to or taken away or revoked by the head or national body granting it, the subordinate body shall dissolve and the property of and obligations owed to the subordinate body shall be delivered to the head or national body and disposed of in accordance with the laws of the head or national body. . . ."

Section 605dd was enacted as part of the same statute (i.e., Stats. 1939, ch. 148, § 2, p. 1262) that the court relied upon in *Protestant Episcopal Church* to find an express trust in the property of Holy Apostles Church.

In its statement of decision, the trial court pointed to section 9132 of the Corporations Code, which, it noted was "formerly section 9301 enacted 1947 and amended 1949." The trial court concluded that those sections *permitted* the "Articles of Incorporation of a subordinate corporation instituted or created under the authority of a head organization" to provide for the distribution of assets to the head organization in the event of dissolution of the subordinate body; and that such a provision, to be effective must be *expressly provided* in the articles. The court found no such express provision in KUPC's articles and concluded that this was "very significant in defeating any claim of an express trust."

But KUPC was incorporated in 1945, before Corporations Code sections 9132 or 9301 were enacted or amended. In 1945, the law regarding nonprofit subordinate bodies was found in Civil Code sections 594.5, 605dd and 605e. (Stats. 1939, ch. 148, §§ 1 & 2, pp. 1262-1263.) The statutory law in 1945 did not require that such provisions be expressly provided in the articles; rather, such provisions were self-executing, and KUPC's reference to them in its articles of incorporation was all that was required to invoke their application to KUPC.

Furthermore, the facts of this case are analogous to the "set of facts," as articulated in *Protestant Episcopal Church* v. *Barker, supra*, 115 Cal.App.3d at page 623, where one of the four churches, Holy Apostles, was "identified both as an integral part and as a subordinate body of" the national denomination. Indeed, the language of plaintiff's organizational documents in this case does exactly the same thing. The articles recite that the corporation will be subject to the doctrines and discipline of PCUSA, and the bylaws recite that the corporation is part of Presbytery.

4.  *The PCUSA constitution supports a finding of trust.*

At the time this dispute arose, the Book of Order of PCUSA provided that church property was held in express trust, for the use and benefit of PCUSA. This factor also supports a finding of express trust.

The trial court, however, circumvented the clear expression of the Book of Order and found no evidence that the Book of Order contained such provisions when the Church was organized in 1906, when it acquired land in 1937 or when it was incorporated in 1945. In reaching this conclusion, the trial court overlooked two critical points.

Firstly, the United States Supreme Court, in *Jones*, invited the very type of provision now found in the Book of Order. Here, the amendments adding the trust language to the Book of Order were made several years before the dispute at bench erupted; further, the amendments are reflected in a "legally cognizable form"—in fact, they are reflected in precisely the kind of document to which Corporations Code section 9150, subdivision (a) refers in its definition of corporate "bylaws."

Secondly, the trial court failed to recognize that, in a hierarchical church such as PCUSA, where authority rises in a series of elected governing bodies from the session, through presbytery to the General Assembly, the elders and pastors of member churches vote upon and eventually enact amendments to the Book of Order. KUPC participated in the Presbytery's deliberations about these particular amendments, and Presbytery voted in favor of these provisions when they were enacted into the Book of Order at the reunion which formed PCUSA.

5. *State statutes support finding of a trust.*

The fourth factor mentioned in the *Protestant Episcopal Church* case is state statutory law. In the instant case, the plaintiff corporation was incorporated with reference given to the exact statutory provisions referred to in the articles of the Holy Apostles Church. Further, since *Protestant Episcopal Church*, Corporations Code section 9142 has been amended, and as discussed above, it adds further support to a finding of an express trust.

DISPOSITION

The judgment is reversed and remanded with directions to enter judgment (a) denying plaintiff's claims to quiet title to the Church property and for declaratory relief, (b) restoring possession and use of the Church property to the true Church congregation as designated by Presbytery, (c) directing through a writ of possession that Rev. Woo and his faction be removed from the premises and (d) declaring that the plaintiff corporation's right, title and interest in the Church property is held in trust for the use and benefit of

PCUSA, subject to the direction of Presbytery. Appellants to recover costs on appeal.

Lillie, P. J., and Johnson, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 29, 1991.