[No. B134338. Second Dist., Div. Four. Jan. 27, 2000.]

KOREAN PHILADELPHIA PRESBYTERIAN CHURCH et al., Plaintiffs and Respondents, v.
CALIFORNIA PRESBYTERY et al., Defendants and Appellants.

**COUNSEL**

McGuinness & Associates and Joseph G. McGuinness for Defendants and Appellants.

William J. Cleary, Jr.; Calabro Law Offices, Alfred A. Calabro and Elizabeth Nazarian for Plaintiffs and Respondents.

## OPINION

**CURRY, J.**—This case involves a dispute between a church, respondent Korean Philadelphia Presbyterian Church (the Church), and the organizations above it in its religious hierarchy. We are called on to decide whether the trial court abused its discretion in granting a preliminary injunction requested by the Church which prohibits the California Presbytery (the Presbytery) and one of its employees, "and all persons acting in concert or participating with them" from: coming onto the Church's property other than to participate in worship services, disturbing worship services or other of the Church's functions, disturbing the Church's business meetings, entering into contracts or commercial relationships in the name of the Church, or using the name of the Church "in any manner or for any purpose other than in connection with litigation." Because we conclude that the preliminary injunction was overbroad, we agree that it should be dissolved. At the same time, we make clear that many of the issues put forth by the parties are not properly justiciable because of their religious nature, unripeness, or absence of a party with standing, and remand the case to the trial court for further proceedings consistent with the views set forth in this opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint*

The Church and co-respondent Reverend James Insoo Cho filed a complaint on May 11, 1999, naming appellants the Presbytery and its employee Edmund Lee[1] as defendants. According to the complaint, James Insoo Cho became pastor of the Church in July of 1998. In late 1998, a dispute arose between the Church and its former pastor, Reverend Chun Il Cho,[2] over money claimed to be owed to him. Chun reported the dispute to the Presbytery, an association of churches of which the Church was a member, and the president of the Presbytery asked James to resign. Thereafter, as will be discussed in greater detail, (1) the Church purported to withdraw from the Presbytery; (2) the Presbytery purported to terminate James as pastor of the

---

[1] Edmund Lee is sometimes referred to in the record as "Edmund Rhee." We call him "Lee" in order to conform to the pleadings.

[2] Because their last names are the same, James Insoo Cho will hereafter be referred to as "James" (or respondent) and Chun Il Cho will be referred to as "Chun."

Church and assign a new pastor; and (3) Lee on behalf of the Presbytery came to the Church facility with a group of followers one Sunday, purportedly to take control of the worship services, which led to a physical confrontation and police intervention.

In their prayer for relief, respondents sought a preliminary injunction to prevent appellants from interfering with worship services and other Church functions and disrupting its day-to-day operations. The declaratory relief action sought a declaration that the Church was the owner of all land, buildings, and personal property at the premises; was not subject to the jurisdiction or control of the appellants; and that James was the duly elected and presently acting senior pastor of the Church. Respondents also sought a temporary restraining order (TRO) restraining appellants and their agents from: coming onto the Church's property for any purpose other than to participate in religious worship services; disturbing or interfering with any of the worship services or other functions at the Church; disturbing or interfering with the business meetings of the Church; entering into any contracts, agreements or obligations with any third persons in the name of the Church; representing that they were authorized to act for or on behalf of the Church; establishing any bank accounts in the Church's name; or using the name of the Church in any manner or for any purpose other than in connection with the litigation.

*The TRO Application*

In a declaration filed in support of the TRO application, Alfred Calabro, respondents' attorney, stated that he was told by Joseph McGuinness, the attorney for appellants, on May 6, 1999, that the Presbytery had removed James as pastor of the Church and that his clients would take possession of the Church building and its pulpit on Sunday morning, May 9, at the 9:00 a.m. worship service.

Benjamin Yoon, a deacon of the Church, confirmed Calabro's account of the telephone conversation with appellants' attorney and the threat to take physical control of the Church's property.

James stated in a separate declaration that: the bylaws of the Church provide that its affairs are to be governed by a board of directors known as the "Consistory" or "Session"; the Session consists of James and nine ruling elders; on April 12, 1999, he wrote to the Presbytery to inform them that the Session had voted to withdraw from the Presbytery if it intervened in its internal audit of financial records; on April 21, 1999, the Session voted to

withdraw the Church's membership in the Presbytery;[3] the Session's vote was followed by a congregation vote to withdraw on May 2, 1999;[4] the Presbytery was informed on May 4, 1999; on May 6, the Presbytery informed James that he was terminated; and on May 5, appellant Lee, a member of the Presbytery, asked James if a separate worship service could be conducted by a temporary pastor to be sent by the Presbytery.

James's declaration also related the following version of the altercation, which occurred on May 9, 1999: Lee and a group of about 30 others came onto the Church grounds. Unbeknownst to James, one of the Church's janitors had secretly placed a new lock on the inside of the main entrance, apparently to prevent him and the congregants who supported him from entering. James and his supporters broke a window to access the building. They had arranged to have security guards placed at the Church's entrance. The guards attempted to prevent Lee and his group from entering. A pushing and shoving match ensued. Police were called and initially forced Lee's group to disperse. Eventually, the police ordered everyone to withdraw from the property "pending the issuance of an appropriate court order."

James's account of the May 9 incident was confirmed by Benjamin Kang, the "Chief Elder" of the Church. Kang was the person who called 911. He did it because Lee and some of the people with him tried to force their way into the building by pushing the security guards out of the way.

The opposition to the TRO application[5] charged that James was attempting to secure ownership and control of the Church property worth millions of dollars, including the Church facility, a parking lot, and two apartment complexes. A declaration submitted by Donald Cho (the son of former pastor Chun) stated that he was a deacon of the Church, was present at a congregational meeting when James announced "a desire" to leave the "Korean American Presbyterian Church." His version of the May 9 incident was that, as a longtime congregant, he appeared with his family at the Church facility in order to worship and was turned away by Calabro and the security guards. Former pastor Chun submitted a declaration in which he stated he was also present at a congregational meeting in which James announced "a desire" to leave the Presbytery. He did not state whether a vote to withdraw occurred at that meeting.

---

[3]The resolution to leave the Presbytery and transfer to another if the Presbytery attempted to intervene in the matters pertaining to James or the Church passed five to three at a meeting of the Session, which consisted of James, Chang Uk Kang, Nam Young Lee, Young Ha Do, Kum Seong Chi, Suk Won Kim, Sun Hwan Kim, Byoung Sam Park, and Ji Yong Choi.

[4]The count was 176 to withdraw, 64 to remain, and 10 abstentions.

[5]The TRO was sought on an ex parte basis with less than 24 hours' notice.

The court granted a TRO and order to show cause precluding appellants and their "agents, servants, employees, and representatives, and all persons acting in concert or participating with them" from "(a) Coming upon the property owned and occupied by the [Church] . . . , for any purpose other than to participate in religious worship services which are part of the regularly scheduled church worship services of the [Church]; [¶] (b) Disturbing or interfering with any of the worship services or other church functions of the [Church] . . . ; [¶] (c) Disturbing or interfering with any of the business meetings of the [Church] during the pendency of this action; [¶] (d) Entering into any contracts, agreements or obligations with any third persons or entities in the name of the [Church]; [¶] (e) Representing to any person or entity that [appellants] . . . either individually or together are authorized to act for or on behalf of [the Church]; [¶] (f) Establishing any bank accounts or other commercial relationships with any banking institution in the name of the [Church]; [¶] and (g) Using the name of the [Church] in any manner or for any purpose other than in connection with litigation."

*The Cross-complaint*

After the TRO was granted, appellants filed a cross-complaint against James alleging that he was engaging in ultra vires acts in excess of his authority as a church officer.[6] The cross-complaint alleged that the current board of directors for the Church held a meeting on May 13, 1999, and passed a resolution terminating James as president and banning him from entering onto Church property. The board also allegedly voted to ask the court to dissolve the TRO. The cross-complaint further claimed that James did not request or obtain authorization for the board to institute the underlying legal action. The cross-complaint sought a declaration that the board of directors controls the property of the Church and that James had not obtained their approval for his exercise of power and control.

*The Bylaws*

The "Bylaws of the Korean Philadelphia Presbyterian Church," attached as an exhibit to the cross-complaint, stated that the corporation was to have five directors and that the number could be changed "only by amendment of the Articles of Incorporation . . . , or by the repeal of this Bylaw and adoption of a new Bylaw, by the vote or written consent of the members entitled to exercise a majority of the voting power." The directors were to "exercise the powers of the corporation, control its property and conduct its affairs, except as otherwise provided by law." Directors were to be "elected

---

[6]The cross-complaint also contained claims for assault, battery, conversion, and fraud.

at the annual meeting," and each director was to hold office "until the next annual meeting of the members and until his successor is elected and qualifies." Vacancies caused by the death, resignation, or disability of a director, or by his removal from office, could be "filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director." Alternatively, "[t]he entire Board of Directors, or any individual director, may be removed from office at any time by the vote of a majority of the members of the corporation. If any or all Directors are so removed, new Directors may be elected at the same meeting and they shall hold office for the remainder of the terms of the removed Directors."

Membership meetings were to be held "annually on the first day in April each year beginning with the year 1977 at 6:00 p.m. . . ." Special meetings could be called by the president, the secretary, or by any two directors and held "at such times and places within or without the State of California as may be ordered by resolution of the Board of Directors or by members holding not less than 30 percent or more of the voting power of the corporation." Written or printed notice of the time and place of every special meeting was to be "delivered personally to each member or sent to him by United States mail, postage prepaid, at least seven (7) days prior to the meeting." Meetings were to be presided over by "the President of the corporation or, in his absence, by the Vice President or, in the absence of both, by a Chairman chosen by a majority of the members present."

Board of directors special meetings could be called by the president, vice-president, or any two directors. A quorum consisted of no fewer than three directors, and any act undertaken by a majority of the directors at a meeting where a quorum was present "is the act of the Board of Directors . . . ."

Officers were to be elected by the directors and could be removed with or without cause by a majority of the directors.

The minister was to be chosen "by a two thirds vote of the qualified members of the church present at any meeting legally called for the purpose" and "serve as such for life or until dissolution of the corporation or until he is dismissed or resigns . . . ." A "[t]wo thirds vote of the voting members present at any meeting legally called for the purpose and which a quorum is present shall be required to dismiss the minister from office."

*The May 13 Resolution*

Also attached as an exhibit to the cross-complaint was a resolution dated May 13, 1999, signed by Chun, Shin Myung Cho, and Eun Chul Kwak,[7] stating that the board of directors resolved to take the following actions: (1) to defend against the action brought by respondents; (2) to declare the TRO obtained in the name of the Church by respondents without authorization and agree to proceed to dissolve it; (3) to obtain a TRO against James similar to the one then in effect; (4) to nominate and appoint Jung Chun Suh as a board replacement for Kwang Chul Kim, who had died; (5) to terminate James as an officer of the Church and Yoon as secretary of the Church and to appoint Jung Chun Suh as president and Young Ha Doh as secretary in their stead; and (6) to disavow the retention of Calabro and to demand a return of all legal fees paid to him.

*The Competing Applications for Preliminary Injunction*

Appellants sought an order to dissolve the TRO and applied for a preliminary injunction of their own, seeking to prevent James from coming onto Church property, disturbing worship services or business meetings, entering into contracts in the name of the Church, representing to third parties that he was authorized to act for the Church, establishing bank accounts in the Church's name, taking or using Church property, posting guards on Church property, or using the name of the Church in any manner or for any purpose other than in connection with the litigation.

In a supporting declaration, Chun stated that he had been a member of the board of directors of the Church since 1976, and he had had no notice of any meeting to change directors or amend the bylaws. He further stated that he received a letter from James saying that he was withdrawing from membership in the Presbytery, and concluded that that action constituted grounds to ban James from Church property. Accordingly, "at a recent regularly held meeting of the Board of Directors" the resolution previously described was adopted.

Eun Chul Kwak also submitted a supporting declaration. He stated that he has been a director since 1976. He, too, stated he had no notice of any meeting to elect new directors or change the bylaws. He concurred with

---

[7]The articles of incorporation for the Korean Philadelphia Presbyterian Church dated November 8, 1976, were attached as an exhibit to an application to dissolve the TRO and issue a new and different TRO. The articles stated that Chun, Shin Myung Cho, Eun Chul Kwak, Cho Ho Kim, and Kwang Chul Kim were "to act in the capacity of Directors until the selection of their successors . . . ."

Chun concerning the need to ban James from Church property and adoption of the May 13 resolution.

Shin Myung Cho in a declaration stated that he had been a director since 1976.[8] His declaration expressed the same understandings as those of Chun and Kwak.

Donald Cho submitted a declaration in which he stated that he met with James and invited him to attend a board of directors meeting on May 13, and that James refused. The letter presented to James, noticing the meeting, was also dated May 13 and signed by Chun only.

In opposition to appellants' request for a preliminary injunction, James submitted a declaration in which he stated that there had been no vote by the membership of the Church to remove him from office, and that the Church had not entered into any agreement that would deprive it of the right to administer its own property and affairs or prevent it from withdrawing from the Presbytery. He expressed the opinion that removing him as pastor and substituting someone appointed by the Presbytery would "likely result in a significant drop in attendance and would be detrimental to the congregation as a whole." Also submitted in opposition to appellants' request for preliminary injunction, Benjamin Kang's declaration confirmed that there had been no vote to remove James or to elect Jung Chun Suh as pastor, and that "replacing Pastor [James] with a pastor selected by [the Presbytery] would not only violate the By-Laws of [the Church], but would lead to further turmoil within the congregation."

In a supplemental declaration, Kang stated that the meeting of May 13, 1999, at which the directors purported to terminate James, was without proper notice under section 3.04 of the bylaws which required seven days' notice.[9] He further stated that of the original directors named in the articles of incorporation, Shin Myung Cho had resigned, Chu Ho Kim had moved from the area and was suffering from Alheizmer's disease, Kwang Chul Kim was deceased, and Eun Chul Kwak was elderly and did not read or speak English.[10] Kang further stated that Chun resigned as pastor on July 4, 1998, although the implication of this resignation on his board membership was not made clear. Kang believed that the elders, who were elected by two-thirds of the congregation, had taken over and performed the function of the board of directors since the inception of the Church.

---

[8]Another exhibit submitted by appellants indicated that Shin Myung Cho had resigned as director in February 1979. He did not explain this discrepancy in his declaration.

[9]Section 3.04 appears under the heading "Meetings of Members."

[10]According to Kang, although Kwak signed something at the request of Chun's son, he later did not know what it was he had signed. This was confirmed by Kwak's declaration, written in Korean and translated into English.

In a series of declarations submitted in opposition to respondents' request for a preliminary injunction, Chun stated that on May 21, 1999 (after the TRO was granted), he appointed new directors who adopted a resolution virtually identical to the May 13 resolution previously discussed. Jung Chun Suh, Young Ha Doh, Chi Yong Choe, and Sun Hwan Kim signed the May 21 resolution (and a written waiver of notice of meeting) as the new directors purportedly appointed by Chun. Chun submitted a supplemental declaration continuing to express the opinion that the TRO should be dissolved and the request for a preliminary injunction be denied. Jung Chun Suh, Young Ha Doh, Chi Young Choe, and Sun Hwan Kim submitted declarations stating that they were members of the board of directors and elders, and that they supported the resolution to seek the dissolution of the TRO and denial of a preliminary injunction, as well as the removal of James from the property.

Appellants' attorney, McGuinness, denied stating to Calabro prior to May 9 that his clients intended to take possession of the Church building or any other property. Donald Cho denied that a pushing and shoving match occurred on May 9, or that the police ordered Lee and his group to disperse or withdraw from the property. He estimated that the real and personal property belonging to the Church was worth approximately $7 million.

A further declaration from Donald Cho stated that he had assisted the Church in obtaining financing from the State of California a year previously, and was advised by the elders that the documentation pertaining to the board of directors was accurate, and that the board was made up of those identified in the articles of incorporation. This was confirmed by a further declaration from McGuinness, who had been retained to pursue the financing at the time.

A declaration from Jung Chun Suh, a representative of the "General Assembly for the Korean American Presbyterian Church,"[11] stated that the General Assembly—not the Presbytery—decided to terminate James and appoint Suh in his place, and that respondents had not withdrawn from the General Assembly.

In response to appellants' declaration, a supplemental declaration from James stated that neither he nor the Church was a member of the General Assembly. Also according to this declaration, a notice was sent on May 24, 1999, to all members of the Church for a congregational meeting to be held

[11]The General Assembly is apparently a level above the Presbytery, but its exact legal nature is unclear.

on June 6, 1999.[12] During the meeting, 165 attendants voted in favor of (1) removing all members of the current board of directors; (2) increasing the number of the board of directors from five to seven; and (3) electing new members to the board of directors. Only one person voted against the measures and five persons abstained.

Kang submitted a further declaration complaining that the Presbytery had been issuing bulletins containing the name and address of the Church and stating that Suh or someone else other than James was the pastor. In that declaration, Kang explained that the Church was initially affiliated after its incorporation with an organization unrelated to appellants, the Western Presbytery of Korean Presbyterian Church; that the Church session voted to withdraw from that organization and become affiliated with the Presbytery in 1977; and that nothing in the application for affiliation of which he was aware "conveys any right, title or interest in the property owned by the [Church] to the [Presbytery]."

Another round of declarations from appellants followed. Jung Hee Kim, Noah Kim, Jung Ye Paik, Abraham Koh, and Joseph Koh, who said they were members of the Church, stated that they had not received notice of the June meeting and that approximately 100 members of the Church had been attending services at another location. Chun stated that neither of the "Mother church organizations," by which he meant the General Assembly and the Presbytery, sought to control the Church's property; that they sought "only to ensure that a proper spiritual Pastor is leading the . . . Church." Chun and Lee expressed the opinion that the Church bylaws allowed the Mother church organizations to terminate the pastor and appoint a new one. Donald Cho submitted a document called "Korean-American Presbyterian Church[,] The Korean Philadelphia Presbyterian Church Principles and By-laws." This provided that "[t]he principle of this church is governed by the Korean-American Presbyterian Church Bylaws which contains, Government, Constitutional regulations, discipline ordinances and worship patterns" and that "[t]he charged pastor shall minister according to the government of The Korean American Presbyterian Church." The document stated that each church had a "Consistory" to rule over spiritual matters, a "Diaconate Session" to handle finances, and a "Congregational Session" to hear reports. Most decisions were to be made by one-half of the Congregational Session, but "inviting pastors, [and] electing elders[,] deacons, and the Bible Women need[ed] two-third[s] of the sessions vote."

---

[12]The copy of the notice included in the record was signed by James as president of the Church.

The trial court granted a preliminary injunction in essentially the same form as the TRO.[13] The Presbytery and Lee appealed from the order.

Discussion

I

The parties agree on the basic legal principle which must guide our decision in this case. ■ "Where an internal church dispute involves a question of ownership or control of church property which the civil courts can adjudicate by applying ' "neutral principles of law, developed for use in all property disputes," ' the civil courts may properly decide the issues in controversy. (*Jones* v. *Wolf* (1979) 443 U.S. 595, 599-605 [61 L.Ed.2d 775, 782-785, 99 S.Ct. 3020].) But where an internal church dispute turns on 'the resolution . . . of controversies over religious doctrine and practice,' not on a property question resolvable under 'neutral principles of law,' the civil courts may not adjudicate the dispute. (*Presbyterian Church* v. *Hull Church* (1969) 393 U.S. 440, 449 [21 L.Ed.2d 658, 665, 89 S.Ct. 601]." (*Vukovich v. Radulovich* (1991) 235 Cal.App.3d 281, 291 [286 Cal.Rptr. 547].)

We must also keep in mind that there has been no trial in this matter. By granting the preliminary injunction, the trial court was making a preliminary evaluation of who was likely to be the prevailing party based on the evidence before it at the time. (See *Art Movers, Inc.* v. *Ni West, Inc.* (1992) 3 Cal.App.4th 640, 646 [4 Cal.Rptr.2d 689]; *Baypoint Mortgage Corp.* v. *Crest Premium Real Estate etc. Trust* (1985) 168 Cal.App.3d 818, 823-824 [214 Cal.Rptr. 531].) We are called on to address only the propriety of that preliminary injunction and whether the particular evidence placed before the trial court at the time of its ruling adequately supports it.

Finally, neither we nor the trial court can give advisory opinions or resolve disputes over matters which involve parties not before us even if the parties are united in their desire to have the court resolve unripe issues or claims which the parties have no standing to assert.

II

With all this in mind, we turn to the question of whether the preliminary injunction was properly granted. One ground for overturning the injunction

---

[13]The TRO's prohibition against "[r]epresenting to any person or entity that [appellants] . . . either individually or together are authorized to act for or on behalf of [the Church]" was omitted from the preliminary injunction.

raised by appellants is that James and those supporting him acted in excess of their authority in requesting the injunction. Appellants contend that the board of directors' expression of opposition to the grant of the injunction should be determinative of whether to dissolve the injunction.

As we have seen, by resolution dated May 13, 1999, a group purporting to be the board of directors of the nonprofit Church corporation—Chun, Shin Myung Cho, and Eun Chul Kwak—purported to terminate James as president of the corporation and Yoon as secretary of the corporation and to appoint Jung Chun Suh as president and Young Ha Doh as secretary in their stead. Respondents challenged the resolution, contending in their papers that Shin Myung Cho had resigned as director, that Eun Chul Kwak had not understood the resolution that was put before him to sign, and that the meeting was not properly noticed in accordance with the bylaws.[14]

Chun responded by purporting to select four new directors to replace not only Kwak and Shin Myung Cho, but also Chu Ho Kim (said to be suffering from Alzheimer's) and Kwang Chul Kim (deceased). These four new directors—Jung Chun Suh, Young Ha Doh, Chi Yong Choe, and Sun Hwan Kim—together with Chun, signed the May 21 resolution terminating James as president.[15]

A few days later, on May 24, 1999, James, purporting to act as president of the Church, sent a notice of congregational meeting to discuss removal of the present board and election of James and six others to the board. The members in attendance allegedly voted 165 to zero with one abstention in favor of the new board. However, several declarants who believed themselves to be members of the Church complained that they had not received notice of the meeting. Appellants also argue that because James had been terminated from the office of president by Chun and his appointed directors on May 21, the proper officer was not allowed to preside over the meeting and the membership consequently did not have the opportunity for a valid vote in accordance with the corporate bylaws.

This aspect of the dispute presents a straightforward legal question of the type that courts may resolve by applying "neutral principles of corporate

---

[14]As we have seen, board of directors special meetings could be called by the president, vice-president, or any two directors. A quorum consisted of no fewer than three directors, and any act undertaken by a majority of the directors at a meeting where a quorum was present "is the act of the Board of Directors . . . ." Apparently, respondents also believe that the seven-day notice of special meetings which comes under the heading covering membership meetings, applies to special board of directors meetings.

[15]These five also signed a written waiver of notice of meeting on that date.

governance to the . . . facts before it." (*Korean United Presbyterian Church v. Presbytery of the Pacific* (1991) 230 Cal.App.3d 480, 503 [281 Cal.Rptr. 396], disapproved in part on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725 [29 Cal.Rptr.2d 804, 872 P.2d 143].) Chun believes that the directors he appointed are the official members of the board of directors, whereas James contends that the membership had dismissed Chun and approved a new board. The difficulty here is that neither Chun, nor any member of his board, nor any other member of the Church who opposes James's group's control of the board is a party to this case. The only defendants and cross-complainants are the Presbytery and its employee Lee, neither of whom claims to be a member of the Church or entitled to vote for its officers or directors. ■ A corporate outsider cannot bring suit to challenge a corporation's management or control. Only a shareholder, officer, or director has standing to do so. (See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 127, p. 626 [*"Ultra vires* acts include those beyond the powers or authorized business of the corporation under limitations in its articles, and those acts which, though within its powers, have been performed in an unauthorized manner, e.g., without the vote of shareholders where this was required. [Citation.] Under former law, although the doctrine was looked upon with disfavor, it might be urged in a proper case by either the corporation or third parties as a defense against contractual liability. [Citations.] [¶] In 1929, the doctrine was abolished insofar as it affected relations with *third parties*. Under the present law, '[n]o *limitation upon the business, purposes or powers of the corporation or upon the powers of the shareholders, officers or directors, for the manner of exercise of such powers*' contained in the articles may be asserted '*as between the corporation or any shareholder and any third person.*' (Corp.C. 208(a).)" (Original italics.)].) In the absence of a party with standing to challenge control of the Church corporate organization currently in the hands of James and his group, the numerous factual issues raised with regard to Chun's attempt to appoint four new directors and the membership's attempt to replace all the directors cannot be resolved in this litigation.

### III

■ Alternatively, appellants contend that the injunction is overbroad. Given the facts established by the various declarations and documents as set forth above, we agree. Starting first with the provision which appellants find particularly objectionable, the court prohibited the Presbytery from using the name "Korean Philadelphia Presbyterian Church in any manner or for any purpose other than in connection with litigation." Understandably, the supporters of James find galling the fact that the dissident faction is using that

name or a similar name in its bulletins announcing services of its own at a new location. But there is no evidence that anyone is being confused by this action. As far as can be ascertained from the record, members of the Church who support James and wish to withdraw from the Presbytery know where to go for worship services, as do members who wish to remain with the Presbytery. To prevent an entity from using any name it chooses to identify itself, there would have to be a much greater showing of public confusion than respondents presented to the trial court.

The provisions of the preliminary injunction that prevent the Presbytery from establishing bank accounts or entering into contracts on behalf of the Church or representing to third persons that it speaks for the Church appear entirely superfluous. There was no evidence that the Presbytery has done or intends to do any such thing. ▪ An injunction cannot issue in a vacuum based on the proponents' fears about something that may happen in the future. It must be supported by actual evidence that there is a realistic prospect that the party enjoined intends to engage in the prohibited activity. (See Code Civ. Proc., § 526, subd. (a)(3) ["An injunction may be granted . . . [¶] . . . [¶] . . . [w]hen it appears . . . that a party to the action is doing, or threatens, or is about to do, or is procuring or suffering to be done, some act in violation of the rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual."]; *East Bay Mun. Utility Dist.* v. *Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1126 [51 Cal.Rptr.2d 299] ["An injunction properly issues only where the right to be protected is clear, injury is impending and so immediately likely as only to be avoided by issuance of the injunction. [Citation.]"].)

▪ We hasten to add that the Church might have reason to believe that Chun and the group that he purported to name directors will, at some point, attempt to enter into contracts or undertake some other action in the name of the Church. But the injunction is not specifically directed at them and they are not parties to this lawsuit.

The same problem exists as to the portion of the preliminary injunction which prohibits the Presbytery and Lee from interfering with the Church's business meetings. The only parties who seem at all inclined to do so—Chun and his group of appointed directors—are not parties to the lawsuit. There is no evidence to suggest that the Presbytery or Lee attempted to interfere with any of the Church's business affairs. Even its purported termination of James cannot be said to constitute such interference. The Presbytery attempted to

terminate him in his position as pastor or spiritual leader of the Church.[16] It is in his position as president—the position from which Chun and his appointed board attempted to oust him—that he is responsible for the corporation's business affairs.

Finally, we address the question of whether an injunction properly issued to prevent the Presbytery and Lee "and their agents, servants, contractors, assigns, representatives and employees, and all persons acting in concert or participating with them" from coming onto the Church's property or "interfering" with its worship services or other Church functions "at all times and at all places." Respondents are on firmer ground here because they presented actual evidence, which the trial court clearly believed, that there was a physical disruption of worship services and an attempt to assert control over the Church's facilities by the Presbytery and its employee. However, in this situation, the court should have taken special care to avoid overbroad language which could cause those with the lawful right to assemble on the Church's property and speak their minds to their fellow congregants to be discouraged from asserting their rights. We are concerned with how this injunction might be read by those members of the Church who support former pastor Chun and favor remaining affiliated with the Presbytery. Unfortunately, they could easily have read the injunction to preclude them from "coming onto Church property" in order to vote at the membership meeting called by James[17] or to preclude them from speaking out against those controlling the Church and in favor of Chun or the Presbytery at "all times and at all places." The fact that not a single dissenter appeared at the membership meeting, whereas 64 voted against disaffiliation, supports our concern that there may have been some such inadvertent confusion. Rather than attempt to narrow the language of the injunction ourselves, however, we remand this matter to the trial court to determine whether: (1) a pressing need for an injunction to prevent physical trespass still exists; and (2) narrower language can be formulated which blocks efforts to seize physical control of the property by third parties but does not discourage members and others with valid rights from coming onto the property to worship or assert their dissenting viewpoints in the ongoing struggle for control of the Church's property and its future course as a religious institution.

## IV

Both sides are anxious that we pass judgment on the issue of whether James has been terminated from his position as pastor of the Church. A

---

[16]At least, this was appellants' original position. Later, they contended that it was the General Assembly which terminated James as pastor.

[17]We recognize that there is an unresolved factual dispute as to whether dissident members were given notice of this meeting.

pastor is primarily a religious leader. As such, a court must avoid embroiling itself in issues of whether he or she is subject to termination from a position in the denomination's hierarchy for failing to follow its tenets. On the other hand, there are certain legal benefits associated with the office, such as salary and working conditions, and it may be appropriate for the courts to decide whether a pastor has been terminated in accordance with the applicable procedures where these types of benefits are at issue. (See, e.g., *Providence Baptist Church v. Superior Ct.* (1952) 40 Cal.2d 55, 60-61 [251 P.2d 10] ["As long as civil or property rights are involved, the courts will entertain jurisdiction of controversies in religious bodies although some ecclesiastical matters are incidentally involved. . . . Necessarily involved in the determination of who shall be pastor is the question of who shall receive the emoluments of the office, which presents a problem involving civil and property rights."].)

On the question of whether James is entitled to the legal benefits of the position of pastor, we are again stymied by the lack of standing on the part of the parties before us. The evidence in the record indicates that James's salary is paid by the Church, not the Presbytery or the General Assembly. The record also includes declaration testimony to the effect that James was duly appointed pastor in July 1998, and the bylaws of the Church, which require a two-thirds vote of the membership to oust the pastor. The Church has taken no action on his employment as pastor and apparently continues to pay his salary and enjoy the benefits of his labor. Thus, the issue of whether *the Church* can terminate James in some other fashion than that set forth in its bylaws, and so deprive him of the economic and legal benefits of that office, is not properly before us since the Church has not purported to terminate him and no member, officer, or director of the Church is seeking to have that matter adjudicated. Nor is the General Assembly, which purported to "terminate" James as pastor, a party to this litigation. The Presbytery, which now denies having been involved in the termination, does not appear to have the standing to assert whatever rights the General Assembly may have in this regard.[18]

The parties are also eager to have the courts resolve the issue of whether the Church properly disaffiliated from the Presbytery and/or the General

---

[18]We also note that neither the Presbytery nor the General Assembly has produced evidence of a legally enforceable agreement with the Church or James which entitles it to control his employment. Appellants direct our attention to a set of written principles and bylaws that express the Church's determination to be governed by the Korean-American Presbyterian Church Bylaws insofar as "Government, Constitutional regulations, discipline, ordinances and worship patterns" are concerned and that require the pastor to "minister according to the government of the Korean American Presbyterian Church." But the questions of whether the Church *is governing itself* by these principles and whether the pastor is properly ministering in accordance with them appear to be disputes over religious doctrine concerning which the courts must maintain a hands-off posture. Appellants further stressed that the Korean

Assembly. On this point, respondents presented evidence that in 1977 the Church became affiliated with the Presbytery by filling out an application, and that on April 21, 1999, and May 2, 1999, first the Session and then the membership voted to dissolve the relationship with the Presbytery. Respondents presented nothing to explain the circumstances surrounding this vote, such as whether or how it was noticed, who presided, who was permitted to vote, etc. On the other hand, appellants presented no evidence concerning the "proper" way to disaffiliate from the Presbytery. The Church apparently withdrew from its prior affiliation in 1977 by sending a short letter signed by the pastor, the secretary, and members of the board of elders.

The problem here is that there appears to be no legal—as opposed to religious—consequence of the Church's decision to dissolve the relationship. Generally, the court can step in only where the affiliation dispute centers around the question of whether the local church or the higher body has the right to use and control church assets. For example, in *Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d 480, the court immersed itself in church doctrine, including the Book of Order, to resolve a dispute between competing factions of a local church, the Korean United Presbyterian Church of Los Angeles. One faction of the local church wished to secede from the higher body—the Presbytery of the Pacific and the Presbyterian Church (U.S.A.) (PCUSA)—while a smaller, dissident faction wished to remain. The court was compelled to take a position because this was not simply a question of disaffiliation. The Presbytery of the Pacific and PCUSA claimed that the local church held its property in trust for the benefit of the PCUSA as expressed in the Book of Order,[19] and sought a court ruling upholding their determination that the dissident faction was entitled to the use and enjoyment of the local church's property. After reviewing the undisputed evidence, the court sided with the Presbytery of the Pacific and PCUSA because the Book of Order was "expressly referenced in [the local church's] articles of incorporation and in its corporate bylaws as the canon law to which the corporation is to be subject and is to adhere." (230 Cal.App.3d at p. 489.) In other words, the articles of incorporation, "tied governance of the [local church's] corporation directly to the

American Presbyterian Church Book of Church Order (or Book of Order) sets up a hierarchy of command and decision making between the local church, the Presbytery, and the General Assembly. We see nothing to indicate that the Book of Order is a legally binding contract entered into by James and/or the Church. (See discussion, which follows.)

   [19]The Book of Order provides: " 'All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the [PCUSA], whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, . . . is held in trust nevertheless for the use and benefit of [PCUSA].' " (*Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d at p. 489, italics omitted.)

constitution of [PCUSA] and its Book of Order, setting forth the form of government for the [local church]." (*Id.* at p. 504.) As a result, the provisions of the Book of Order "govern[ed] both [the local church], as an unincorporated religious body, and . . . as the nonprofit corporation formed to conduct [its] temporal affairs." (*Id.* at p. 489.)

There are two obvious distinctions between that case and the case before us. First, appellants here have repeatedly stated that they have no claim on the Church's property or assets. This difference makes the current situation closer to that in *Vukovich v. Radulovich, supra,* 235 Cal.App.3d 281, where the court held that trial court had no jurisdiction to grant relief in an affiliation dispute between disparate factions of a church. The majority of the members of the church involved in that case had voted to reunite with the local Diocese with which it had previously been affiliated. The minority brought suit, charging that the vote was invalid under the church's bylaws, and asked that the court decide whether they or other members had been deprived of their rights to notice and to cast their ballot. In asking the court to decide whether the majority had complied with the bylaws, the minority faction missed "the key point" in the court's view: "regardless of how they characterize the gravamen of their complaint, to show that the civil courts may exercise jurisdiction in this case plaintiffs must first show that the dispute turns on a present controversy over church property which may be decided by applying 'neutral principles of law.' [Citations.] Plaintiffs cannot clear this jurisdictional hurdle. Nowhere in plaintiffs' opening brief do they show that there is any present controversy over the ownership or control of [the church's] property. If there is no such controversy, we lack jurisdiction to scrutinize whether church bylaws were properly observed as [the church's] voting membership made the religious and ecclesiastical decision to rejoin the Mother Church." (235 Cal.App.3d at pp. 292-293.)

Second, even if appellants were to change their position and seek to assert control over the Church's property in reliance on the provisions in the Book of Order quoted in *Korean United Presbyterian Church v. Presbytery of the Pacific, supra,* 230 Cal.App.3d 480, the articles of incorporation that govern the Church as a nonprofit corporation do not reference the Book of Order or promise to be subject to its terms for purposes of corporate governance.[20] In this regard, our case is more analogous to the situation in *Protestant Episcopal Church v. Barker* (1981) 115 Cal.App.3d 599 [171

---

[20]We do not mean to suggest that before a higher religious body can legitimately assert an interest in a local church's assets there must be an express reference in the church's articles of incorporation to the higher body's rules or laws. The statutory provisions governing nonprofit religious corporations discuss various methods by which the assets of a religious corporation may be deemed to be impressed with an express or implied trust. (See Corp.

Cal.Rptr. 541], where the court held that three churches that "held title to their property in their own names, paid for it out of their own funds, did not alienate it in any express manner in their articles of incorporation, and did not subject themselves to express restraints on their property by reason of the constitution, canons, and rules of [the national organization] and the Diocese" did not transfer any rights to those bodies.[21] (115 Cal.App.3d at p. 625.)

In sum, unless there is some property issue at stake, the courts cannot involve themselves in a local church's decision concerning whether to affiliate or disaffiliate with a particular regional or national religious organization. The question of whether the Church followed proper procedures in its disaffiliation from the Presbytery and/or the General Assembly is not one that can be resolved by a court of law.

### DISPOSITION

The order granting the preliminary injunction is reversed and the preliminary injunction is dissolved. The case is remanded for further proceedings consistent with the views set forth in this opinion. Each party is to bear its own costs.

Vogel (C. S.), P. J., and Epstein, J., concurred.

On February 9, 2000, the opinion was modified to read as printed above.

---

Code, § 9142, subd. (c).) We highlight this particular distinction because appellants rely heavily on *Korean United Presbyterian Church* v. *Presbytery of the Pacific, supra,* 230 Cal.App.3d 480, and suggest by implication that the situation here is identical to the situation there.

[21]The court held, however, that the property of a fourth church involved in the litigation was subject to an express trust in favor of the diocese where the church was "specifically identified as a subordinate body of a national body" in its articles of incorporation; it was incorporated subsequent to the adoption of a diocesan canon, which declared that on dissolution of a church its property would revert to the diocese; and the church had a specific provision in its articles declaring that on "liquidation, dissolution, or abandonment of the corporation its property [would] inure to the benefit of a charitable fund organized and operated for religious or charitable purposed by the Diocese." (*Protestant Episcopal Church v. Barker, supra,* 115 Cal.App.3d at pp. 625-626.)